667 F.2d 1146
 Henry GORHAM, Appellant,
v.
Don T. HUTTO, Director of Virginia Department of
Corrections; J. P. Mitchell and E. Wright,
Individually and in their own capacity,
Appellees.
Kenneth Richard Lee TAYLOR, Appellant,
v.
T. D. HUTTO, Director of Corrections, O. Garland,
Administrative Assistant and Gene Johnson,
Superintendent of Powhatan Correctional
Center, State Farm Virginia,
Appellees.
Thomas PENN, Appellant,
v.
Terrell Don HUTTO, Director of Virginia's Department of
Corrections; M. Bowermaster, Meeting Chairman of Central
Classification Board Division of Adult Services; and Gene M.
Johnson, Warden of Powhatan Correctional Center, Appellees.
 Nos. 81-6020, 81-6066 and 81-6085.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 7, 1981.
Decided Dec. 30, 1981.
 
 Bruce E. Arkema, Richmond, Va. (Rilee, Canton & Arkema, Richmond, Va., on brief), for appellants.
 Burnett Miller, III, Asst. Atty. Gen., Richmond, Va. (Marshall Coleman, Atty. Gen. of Virginia, Richmond, Va., on brief), for appellees.
 Before HALL, MURNAGHAN and CHAPMAN, Circuit Judges.
 CHAPMAN, Circuit Judge:
 
 
 1
 Three Virginia prisoners appeal from the dismissal of their pro se complaints alleging civil rights violations. Each of the appellants filed a complaint alleging that his transfer from either the Virginia State Penitentiary or the Powhatan Correctional Center to the Mecklenburg Correctional Center ("M.C.C.") was accomplished without affording him the notice or hearing mandated by the Fourteenth Amendment. The U. S. District Court for the Eastern District of Virginia dismissed the complaints sua sponte. This court appointed counsel for appellants and the matter was set for briefing and oral argument on the issue of "whether Virginia prison guidelines created a justifiable expectation of certain due process rights regarding transfers to the Mecklenburg Correctional Center, and, if so, whether the prisoners were accorded due process."
 
 
 2
 The complaint filed by appellant Henry Gorham states that he was twice moved from the Virginia State Penitentiary to M.C.C. as a result of arbitrary decisions by the Institutional Classification Committee ("I.C.C.") of the State Penitentiary. Gorham alleges that in February of 1977, while at the State Penitentiary, he was convicted of assaulting another inmate. After serving a 15 day segregation for this offense, Gorham was referred to a State Penitentiary I.C.C., which then transferred him to M.C.C. Gorham's complaint does not reveal what type of notice or hearing he received from this I.C.C. before his transfer.
 
 
 3
 Gorham claims he stayed at M.C.C. for the next forty-two months, after which time an I.C.C. at that institution recommended that he be returned to the general population of the State Penitentiary. Upon arriving at the State Penitentiary, Gorham was delayed in the processing unit of the penitentiary until a cell in the general population was available. While Gorham was awaiting assignment to the general population, prison officials received four written statements from other inmates in the general population expressing fear at the prospect of his admission to the general penitentiary population.
 
 
 4
 Gorham claims that on July 29, 1980 a State Penitentiary I.C.C. appeared at his holding cell and conducted a hearing in front of it. He claims that contrary to institutional policy, the hearing was not recorded, he was denied the right to call witnesses, and he was denied the right to examine the physical evidence against him (written statements of the four inmates). After the hearing, upon the I.C.C.'s recommendation, Gorham was transferred back to M.C.C.
 
 
 5
 The complaint filed by appellant Kenneth Taylor alleges that on September 24, 1980, as a result of a riot that took place at the Powhatan Central Center, he was transferred from that Virginia institution to M.C.C. without a hearing.
 
 
 6
 The complaint filed by appellant Thomas Penn states that he was initially transferred to M.C.C. where he stayed for approximately thirty-eight months. Penn was transferred to the general population of the Virginia State Penitentiary on May 9, 1980. The complaint states that on May 10, 1980, Penn was taken from his cell in the general population to the maximum security building and held there. Penn states that he was given a hearing before the I.C.C. on May 13, 1980, where it was stated that prison officials had received reliable information that Penn's life would be in danger if he remained in the general population of the penitentiary. The I.C.C. transferred him to the general population of Powhatan Correctional Center.
 
 
 7
 After arriving at Powhatan, Penn was held in maximum security even though he claims that there was adequate space for him in the general population of the prison. On June 6, 1980, while still located in the maximum security section, Penn received notice that a hearing was to be conducted to consider transferring him to a higher security. Penn was given a hearing before an I.C.C. on June 10, 1980, at which time a prison sergeant testified that he had received reliable information that "conflict would occur" and Penn would be murdered if placed within the general prison population. This hearing resulted in Penn being assigned to segregated status for 30 days pending further investigation of his situation.
 
 
 8
 Penn further alleges that he was escorted before an I.C.C. for another hearing on July 8, 1980. At this hearing Penn states that a student psychologist presented a letter stamped "Confidential" to the I.C.C. as well as his evaluation of Penn. The police sergeant was also allegedly present and testified that his information that "conflict would occur" and Penn would be murdered if placed within the general prison population had not changed. Penn claims that he was not permitted to call witnesses at this hearing, to examine any of the physical evidence submitted in support of his transfer, or to cross-examine any of the witnesses testifying in favor of his transfer. The complaint states that as a result of this hearing Penn was transferred to M.C.C.
 
 
 9
 Each of the complaints filed by appellants alleges a denial of due process of law because the complainant was transferred to M.C.C. without benefit of adequate notice or a proper hearing. The complainants seek injunctive relief and damages pursuant to 42 U.S.C. § 1983.
 
 
 10
 To prevail on their claims under 42 U.S.C. § 1983, appellants must have alleged a deprivation of a property or liberty interest. Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Appellants concede that the applicable Virginia statutes did not afford them a property or liberty interest in not being transferred to M.C.C. Instead, they claim that Virginia Department of Corrections Division of Adult Services Guideline No. 821 afforded them a property or liberty interest in not being transferred to M.C.C. This administrative policy guideline sets forth certain procedural prerequisites to the transfer of inmates to M.C.C.[1] Since we find that prison policy guidelines are not a sufficient basis for affording state prisoners a liberty interest in not being transferred to other prison institutions within the same state, appellants' claims to "liberty interests" arising from Guideline No. 821 must fail.
 
 
 11
 In cases involving the creation of due process interests, the United States Supreme Court has yet to hold that a liberty interest can be created by an administrative guideline. In Wolff v. McDonnell, 418 U.S. 539, 556-57, 94 S.Ct. 2963, 2974-75, 41 L.Ed.2d 935 (1974), the creation of a conditional liberty interest in good time credits was based on a Nebraska statute. In Vitek v. Jones, 445 U.S. 480, 488-91, 100 S.Ct. 1254, 1261-63, 63 L.Ed.2d 552 (1980), the creation of a liberty interest in not being transferred to a mental hospital was based on a Nebraska statute. In Arnett v. Kennedy, 416 U.S. 134, 151-52, 94 S.Ct. 1633, 1643, 40 L.Ed.2d 15 (1974), the creation of a property interest in tenured civil service employment was based on a federal statute. In Goss v. Lopez, 419 U.S. 565, 573-74, 95 S.Ct. 729, 735-36, 42 L.Ed.2d 725 (1975), the creation of a property interest in public education was based on an Ohio statute. In Perry v. Sindermann, 408 U.S. 593, 599-603, 92 S.Ct. 2694, 2698-2700, 33 L.Ed.2d 570 (1972), a property interest in tenured professorship was created by implied contract.
 
 
 12
 This court previously considered and rejected the argument that a Virginia prison guideline very similar to Guideline No. 821 created a liberty interest in not being transferred to a higher security. Cooper v. Riddle, 540 F.2d 731 (4th Cir. 1976). Cooper is based on the Supreme Court's opinion in Meachum v. Fano, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), which holds "that the Due Process Clause does not impose a nationwide rule mandating transfer hearings." Id. at 229, 96 S.Ct. at 2540. In reaching its decision in Meachum, the Supreme Court made the following critical observation:
 
 
 13
 Holding that arrangements like this are within the reach of the procedural protections of the Due Process Clause would place the Clause astride the day-to-day functioning of state prisons and involve the judiciary in issues and discretionary decisions that are not the business of federal judges. We decline to so interpret and apply the Due Process Clause. The federal courts do not sit to supervise state prisons, the administration of which is of acute interest to the States. Id. at 228-29, 96 S.Ct. at 2540.
 
 
 14
 Appellants have demonstrated no reason to deviate from the holdings in Meachum and Cooper.
 
 
 15
 APPEAL DISMISSED.
 
 MURNAGHAN, Circuit Judge, dissenting:
 
 16
 A state regulation requiring specific procedures to be observed prior to prison transfers operates in a manner in no whit different from a statute containing the same provision. It is here conceded that, had the procedures been established by statute, the treatment of the plaintiffs in manners violative of what had been prescribed would have been unconstitutional.[1] Yet the majority has held that the Virginia correctional guidelines do not implicate the Due Process Clause, simply because the invaded rights of the plaintiffs were generated by regulation and not by statute. In view of the state's concession at oral argument, and the apparent agreement of the majority, that, if the Virginia legislature had codified the regulations, a protectible liberty interest would have arisen, I feel compelled to dissent. I cannot accept the majority's view that valid regulations, unlike statutes, have no constitutional significance.
 
 
 17
 Beginning in the early 1970's, the Supreme Court defined a new analytical framework for determining which interests the Due Process Clause protects. In Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972), the Court stated:
 
 
 18
 To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined.
 
 
 19
 The Court looked to "rules or understandings that stem from an independent source such as state law" to determine whether a "legitimate claim of entitlement" existed. Id. The independent source was most often a state statute, but "rules or mutually explicit understandings" were also sufficient. Perry v. Sindermann, 408 U.S. 593, 601, 92 S.Ct. 2694, 2799, 33 L.Ed.2d 570 (1972).
 
 
 20
 The framework was soon applied to liberty interests as well as to property interests. The court held that, where a state statute conditions forfeiture of good time credits on a finding of "serious misconduct," prisoners cannot be deprived of the credits without due process. Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). See also, e.g., Vitek v. Jones, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (state statute precluding involuntary transfer of a prisoner to a state mental hospital absent a finding that he suffers from a "mental disease or defect" creates a liberty interest); Meachum v. Fano, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) (transfer of prisoners between prisons does not implicate the Due Process Clause where there is no state law provision restricting transfers).[2]
 
 
 21
 The central theme of the due process analysis is the attempt to "(make) it possible for those who deal with the government in any way to rely on any clearly announced rules...." L. Tribe, American Constitutional Law 515 (1978). If a state government holds out a particular rule to the public, it should not be permitted to deviate from that rule arbitrarily. To a member of the public, there is no difference between a regulation and a statute; both are authoritative pronouncements of law, and violation of either subjects one to the applicable sanctions. Indeed, the Supreme Court has held that regulations, like statutes, have the force of law. E.g., Vitarelli v. Seaton, 359 U.S. 535, 539-40, 79 S.Ct. 968, 972-73, 3 L.Ed.2d 1012 (1959) (Department of Interior regulations held to be binding on the Secretary of the Interior, and action in violation of them was invalid); Service v. Dulles, 354 U.S. 363, 388, 77 S.Ct. 1152, 1165, 1 L.Ed.2d 1403 (1957) (State Department regulations held to be binding on the Secretary of State, and action which violated them was invalid). See also Rodway v. United States Department of Agriculture, 514 F.2d 809, 814 (D.C.Cir.1975) ("It is, of course, well settled that validly issued administrative regulations have the force and effect of law."). If the Due Process Clause protects the public from arbitrary application of statutes, there simply is no reason why it should not provide the same protection against arbitrary application of regulations.
 
 
 22
 Contrary to the majority's contention, the Supreme Court has held that an administrative regulation can create a liberty interest. In Wright v. Enomoto, 462 F.Supp. 397 (N.D.Cal.1976), summarily aff'd, 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756 (1978), the Court affirmed a district court opinion holding that California's state-wide regulations defining circumstances in which inmates could be confined in maximum security created a liberty interest. The district court was explicit:
 
 
 23
 (I)f the state itself imposes limits on its discretion by conditioning decisions such as prison transfers on a specific standard being met, the state creates a liberty interest which is protected by due process. This is true whether the limits which the state imposes on itself stem from statute, rule or regulation.
 
 
 24
 462 F.Supp. at 402.
 
 
 25
 Thus, it is clear that regulations can create a liberty interest; the remaining question is whether Virginia's regulations here do so. The state conceded at oral argument that the regulations are made available to all prisoners. The language of the regulations is mandatory, and their provisions are clear. Guideline 825(I) states, "The purpose of this Division Guideline is to establish a uniform policy and procedure governing institutional reassignment...." Guideline 821(IX)(B)(3) provides in part:
 
 The inmate will:
 
 26
 a. Receive written notification of the hearing....
 
 
 27
 b. be given an opportunity to appear before and address the Committee.
 
 
 28
 c. be allowed to remain silent.
 
 
 29
 d. have an institutional counselor or other institutional employee present to assist him.
 
 
 30
 Additional procedural guidelines follow, and all are phrased as requirements rather than suggestions. The entire tone of the procedural and substantive provisions leaves no doubt that the regulations were intended to be binding. An inmate reading them would have good reason to expect compliance.
 
 
 31
 Moreover, several provisions require factual determinations prior to transfer. For example, Guideline 825(K) permits special purpose assignment only when an inmate has "serious personal security needs as determined by the Central Classification Board...." That predicate finding, like the requirement in Vitek that a prisoner be found to suffer from a "mental disease or defect," calls into play the Due Process Clause. Vitek v. Jones, supra, 445 U.S. at 489-90, 100 S.Ct. at 1261-62. See also Wolff v. McDonnell, supra, 418 U.S. at 557, 94 S.Ct. at 2975 (deprivation of good time credits authorized upon a finding of "major misconduct").
 
 
 32
 In Cooper v. Riddle, 540 F.2d 731 (4th Cir. 1976), we did not hold otherwise. The current Virginia guidelines were promulgated in September, 1977, after we decided Cooper. The majority here describes the regulations then in effect as "very similar" to the current regulations. At 1148. In Cooper, however, those regulations were described as "written procedures used by (the Institutional Classification Committee)." 540 F.2d at 732 n.1. Whatever the similarities between the substantive provisions of the pre-1977 and post-1977 procedures, there is no indication in Cooper that the earlier procedures were anything more than internal memoranda, a far cry from the formally adopted and widely publicized regulations here.
 
 
 33
 To find that the Virginia regulations create a liberty interest would not, as the state contends, impose a straight-jacket on state correctional systems. If the guidelines are unduly restrictive, they can simply be amended. If, however, the state chooses to pass regulations, then it is the essence of due process that it cannot arbitrarily deprive some prisoners of the procedural and substantive rights it has granted to all of them. The opposite result, grounded on the artificial distinction between statutes and regulations, exalts form over substance.
 
 
 34
 Accordingly, I would hold that the correctional guidelines create a protectible liberty interest, and that since, as the state concedes, plaintiffs have alleged violations of the guidelines, the district court erred in dismissing their complaints.[3]
 
 
 
 [1]
 Guideline No. 821 classifies I.C.C. hearings into two types, formal and informal. It lists the types of classification action for which the inmate should be afforded an informal hearing (e.g., custody decreases and job assignments) and the procedures to be observed at informal hearings. It also lists the types of classification action for which the inmate should be afforded a formal hearing (e.g., increases in custody and removals from work/study release) and the procedures to be observed at formal hearings
 
 
 [1]
 At oral argument, the state admitted that "if statutes in precisely the same language existed under the Commonwealth of Virginia setup ... the prisoner (would have) the (constitutional) right." The majority indicates its apparent agreement by emphasizing the distinction between statutes and regulations, without denying that, absent that distinction, a liberty interest would have been created
 
 
 [2]
 Meachum v. Fano in no way intimates that the origin of "state law" can only be a state statute. A regulation amounting to state law would, under the rationale expressed in Meachum v. Fano, require due process application. The Court repeatedly referred to the absence of a state-created right, without limiting the source of the right to state statutes
 
 
 [3]
 I would, however, affirm the dismissal of Gorham's complaint as to his first assignment to Mecklenburg, since that transfer occurred in March, 1977, before the promulgation of the new regulations