Ray Thomas BARTHOLOMEW

v.

L.R. CLAWSON, Supt., et al.

Civ. A. No. 82–0500–R.

United States District Court,
E.D. Virginia,
Richmond Division.

Sept. 7, 1984.

Donald L. Creach, Hunton & Williams, Richmond, Va., for plaintiff..

Guy W. Horsley, Jr., Asst. Atty. Gen., Richmond, Va., for defendants.

## OPINION

WARRINER, District Judge.

Plaintiff, proceeding *pro se* and *in forma pauperis,* under 42 U.S.C. § 1983, filed this action on 4 August 1982. Plaintiff filed an amended complaint on 16 August. Defendants filed a motion for summary judgment accompanied by affidavits on 23 August and filed what they characterized as a motion to dismiss in response to the amended complaint on 14 September. Plaintiff filed a response to defendants' motions on 4 October 1982, and an affidavit in support of his response on 29 October 1982.

On 2 March 1983, this Court granted summary judgment to the defendants herein, relying in part on *Cooper v. Riddle,* 540 F.2d 731 (4th Cir.1976), and *Gorham v. Hutto,* 667 F.2d 1146 (4th Cir.1981). On 11 April, 1984, the United States Court of Appeals for the Fourth Circuit vacated the judgment of this Court and remanded the action in light of *Hayes v. Thompson,* 726

F.2d 1015 (4th Cir.1984), which held that *Cooper* and *Gorham* were overruled.

On 4 May 1984, the Court appointed counsel on behalf of plaintiff and directed the parties to file briefs on the issues presented herein in light of the decision of the Fourth Circuit Court of Appeals. The parties having filed timely briefs, the matter is now ripe for consideration. The Court has jurisdiction under 28 U.S.C. § 1343.

In its opinion herein, the Court of Appeals stated that on remand "the District Court should address whether State regulations create such a liberty interest as to trigger due process requirements. If the answer to that inquiry is in the affirmative, then the Court should go on to determine whether or not Bartholomew received those protections." Although the parties dispute the import of this directive from the Court of Appeals, the Court is satisfied that the Court of Appeals intended this Court to reconsider defendants' motion for summary judgment regarding plaintiff's due process claim, in light of recent developments in that area of the law.

On 29 May 1984, plaintiff filed a motion pursuant to Fed.R.Civ.P. 60(b) for relief from the Court's judgment of 2 March, 1983. Specifically, plaintiff complains that the Court improperly granted defendants' motion for summary judgment regarding plaintiff's first amendment claims of retaliation. Plaintiff apparently bases his motion on Fed.R.Civ.P. 60(b)(6), arguing that to permit the judgment to stand would be "manifestly unjust." Reply Brief on Behalf of Plaintiff, 29 May 1984, at 3. Having reviewed the plaintiff's motion, the Court concludes that plaintiff's retaliation claim was based on his temporary transfer from Caroline Correctional Unit # 2 to the Virginia State Penitentiary on 6 November 1981. The affidavit of John Hinkle clearly states that, at the time they approved this temporary transfer, the members of the CCB were unaware of plaintiff's retaliation claims. Accordingly, plaintiff's motion for relief pursuant to Fed.R.Civ.P. 60(b)(6) shall be DENIED.

The factual situation out of which plaintiff's due process claim arises is relatively simple. The parties agree that on 6 November 1981, while confined to Caroline Correctional Unit # 2, plaintiff was given written notice that he would be brought before the Institutional Classification Committee (ICC) for consideration of a possible increase in security classification and/or a transfer to another prison. The reason proffered for the hearing was that the prison administration had reliable information that plaintiff was planning an escape attempt. At that time, plaintiff signed a "notification of referral" to the ICC which set forth the procedural aspects of the ICC hearing. The notice informed plaintiff that he could be present at the hearing and would be afforded an opportunity to call and examine witnesses. Blanks were provided on the form for plaintiff to list any witnesses he wanted to call; plaintiff signed the notice form without listing potential witnesses. Plaintiff asserts that at the time he signed the notice, however, he was verbally instructed by Sgt. Huffman that he was not to request witnesses.

On 6 November 1981, plaintiff was transferred to the Virginia State Penitentiary by the Central Classification Board (CCB) solely on the basis of the information received regarding plaintiff's involvement in the escape attempt. On 10 November 1981, four days after his arrival at the Virginia State Penitentiary, plaintiff's ICC hearing took place. At the hearing, a counselor from Caroline Correctional Unit # 2 presented information regarding plaintiff's involvement in the escape plan. That information included (1) a tip by a confidential and reliable source that plaintiff was planning an escape, (2) the fact that prison officials had recently discovered three bars partially sawed off, and (3) that plaintiff had transferred a sum of money to an account outside the prison. Plaintiff denied any involvement in an escape attempt and asserted that the only reason he had been called before the ICC was because he had lodged complaints against the administration about prison conditions.

The ICC found the evidence concerning plaintiff's alleged plan to raise a "reasonable suspicion" although this evidence was "not convincing as the truth." The report concluded that, "[g]iven Bartholomew's attitude toward the unit and its employees, however, it would appear to be in the best interest of both the institution and the inmate if he were transferred to another institution." The ICC decided that plaintiff should be transferred to a medium security institution, and that he should remain in segregation until the CCB acted on this recommendation. On 25 November 1981, the CCB approved the ICC recommendation and ordered plaintiff to be transferred to Powhatan Correctional Center. Plaintiff was assigned to segregation pending the transfer.

The first question which this Court must address is whether the Department of Corrections' Guidelines created a liberty interest cognizable under the Due Process Clause of the Fourteenth Amendment.[1] In determining whether the Department of Corrections' Guidelines which were in effect on 6 November 1981 created a liberty interest, the Court is guided by two recent Supreme Court decisions.

In *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), the United States Supreme Court faced a similar question with regard to a Pennsylvania inmate. Aaron Helms, an inmate in the Pennsylvania State Correctional System, was removed from the general prison population following a prison riot and confined to administrative segregation pending an investigation into his role in the riot. *Id.* at 462–463, 103 S.Ct. at 866–867, 74 L.Ed.2d at 682–83. Finding that "the transfer of an inmate to less amenable and more restrictive quarters for non-punitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence," the Court held that only if Pennsylvania had "created a liberty interest in remaining free from the restraints accompanying confinement in administrative segregation, through enactment of its regulations governing prison administration, was Helms entitled to procedural due process." *Id.* at 468–469, 103 S.Ct. at 869–870, 74 L.Ed.2d at 686–687. The Court recognized that "the safe and efficient operation of a prison on a day to day basis has traditionally been entrusted to the expertise of prison officials ... [and] that regulations structuring the authority of prison administrators may warrant treatment, for purposes of creation of entitlements to 'liberty,' different from statutes and regulations in other areas." *Id.* In evaluating the Pennsylvania regulations governing prison administration, the Court found that Pennsylvania had created a liberty interest because "the Commonwealth has gone beyond simple procedural guidelines. It has used language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed, ... and that administrative segregation will not occur absent specified substantive predicates—viz., 'the need for control,' or 'the threat of a serious disturbance.' " *Id.* at 471–472, 103 S.Ct. at 871, 74 L.Ed.2d at 688. The repeated use of mandatory language in connection with substantive constraints on the decisionmaking authority of prison administrators as to when an inmate could be placed in administrative segregation created a protected liberty interest.

Turning to what process was due the inmate, the Court noted that the inmate's privacy interest was not of great consequence in comparison with the governmental interest in the safety of the prison guards and the other inmates. Because the Commonwealth's important interest in isolating him pending an investigation of the charges, the Court held that Helms was entitled only to receive notice of the charges against him and an opportunity to present his views to the prison officials charged with deciding whether to transfer him to administrative segregation. *Id.* at

---

**1.** Both parties agree that plaintiff has no liberty interest deriving from the Due Process Clause itself.

475, 477, 103 S.Ct. at 873, 875, 74 L.Ed.2d at 691, 692.

The Court faced a similar situation in *Olim v. Wakinekona*, 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983). In that case, inmate Wakinekona was transferred from a State Prison in Hawaii to one in California because of his reputation as a trouble-maker. In determining whether Wakinekona had a liberty interest in not being transferred to the mainland, the Court evaluated the prison regulations of Hawaii. The Court noted that only if Hawaii's regulations placed substantive limitations on the discretion of prison officials did they create a constitutionally protected liberty interest. *Id.* at 249, 103 S.Ct. at 1747, 75 L.Ed.2d at 823. "If the decision-maker is not 'required to base its decision on objective and defined criteria' but instead 'can deny the requested relief for any constitutionally permissible reason or for no reason at all,' [citation omitted] the State has not created a constitutionally protected liberty interest." *Id.* In *Olim*, the regulations in question stated that the inmate classification process was not concerned with punishment. The regulations required that a prison administrator appoint an impartial committee to conduct a hearing concerning the inmate's classification. The committee was to give the inmate written notice of the hearing, permit him, with exceptions, to confront and cross-examine witnesses, afford him an opportunity to be heard, and notify him of the committee's findings. The committee was then to make a recommendation to the administrator who had the ultimate authority for the decision. The regulation directed that the administrator, as the final decision maker, might:

"(a) affirm or reverse, in whole or in part, the recommendation; or

(b) hold in abeyance any action he believes jeopardizes the safety, security, or welfare of the staff, inmate ..., other inmates ..., institution or

community and refer the matter back to the program committee for further study and recommendation."

Rule IV, paragraph 3(d)(3), App. 24.

*Id.* 242, 103 S.Ct. at 1744, 75 L.Ed.2d at 818.

Because this regulation did not place any substantive limitation on official discretion, the Court held that it created no liberty interest entitled to protection under the Due Process Clause. The Court noted that "the prison administrator's discretion to transfer an inmate is completely unfettered. No standards govern or restrict the administrator's determination because the administrator is the only decision maker under Rule IV, we need not decide whether the introductory paragraph of Rule IV, see n. 1, *supra*, places any substantive limitations on the purely advisory program committee." *Id.* at 249–50, 103 S.Ct. at 1747–1748, 75 L.Ed.2d at 823. The Court further noted that just because the State had created procedures for the channeling of decision making, those procedures did not in and of themselves create substantive limitations on the decisions made. "Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement ... the State may choose to require procedures for reasons other than protection against deprivation of substantive rights." *Id.* at 250, 103 S.Ct. at 1748, 75 L.Ed.2d at 823–824.[2]

Applying the reasoning of both *Hewitt* and *Olim* to the instant case requires an extensive examination of the Virginia Department of Corrections' Guidelines (DGL) which were in effect on 6 November 1981. The pertinent Division Guidelines which apply to the plaintiff's claims regarding his administrative segregation and subsequent transfer are set forth in full in Appendix A. These administrative regulations are interrelated and, in order to determine whether

**2.** The Court suggests that such procedures may be created to enable prison officials to exercise their discretion intelligently. Such procedures may also serve a therapeutic purpose by permitting inmate participation in the decision-making process. *Id.* at 251, fn. 13, 103 S.Ct. at 1748, fn. 13, 75 L.Ed.2d at 824, fn. 13.

they create a due process liberty interest, they must be read as a whole. DGL # 821 outlines the procedural operation of an Institutional Classification Committee (ICC). DGL # 823 specifically addresses the issue of inmate custody classification, and is complemented by Guideline # 861.1 which prescribes minimum standards for segregation. The requirements for inter-institutional inmate transfers are outlined in DGL # 825. The Court will first address the issue of whether the Virginia Division Guidelines created a liberty interest for plaintiff in not being held in administrative segregation.

On 6 November 1981, plaintiff was transferred to the Virginia State Penitentiary pursuant to DGL # 821, XI, which states:

"Where emergency situations exist, the institution's superintendent or ranking security officer is expected to take whatever action his/her judgment dictates is necessary and essential to prevent the loss of life, bodily injury, or property damage. All such actions taken which result in a custody increase, assignment of segregation status, removal of work/study, release or institutional transfer, are tentative and subject to review by an ICC and a CCB."

After such an emergency transfer, Guideline # 823(d)(3) requires a formal ICC hearing pursuant to the procedural requirements of Guideline # 821, IX, (B)(3). The recommendations of the ICC must be approved by the CCB. Guideline # 821, VIII(I)(1)(a). Section VIII(J) of that Guideline sets forth the inmate's appeal procedure from a CCB decision.

DGL # 823, VIII(C), sets forth the procedures for assignment to segregation status. Segregation is defined as:

"a type of housing reserved as special purpose bed assignments at major institutions and field units utilized under proper administrative process for the protective care and custodial management of inmates. Segregation is designed to provide stringent custodial control and surveillance over those inmates who pose a serious security threat and cannot exist in the general population setting."

DGL # 823, VIII(C)(2), states that all assignments to and removal from segregation status require formal ICC hearings and that all ICC recommendations for continued confinement in segregation status are subject to review and approval by the CCB.

 While Division Guidelines # 821 and # 823 appear to have established mandatory procedures applicable whenever an inmate faces the possibility of confinement in administrative segregation, these Guidelines fail to place "substantive limitations on official discretion." *Olim*, 461 U.S. at 249, 103 S.Ct. at 1747, 75 L.Ed.2d at 823. DGL # 861.1(B)(1) provides that segregation is a "custodial management measure exercised by the institution or unit for the welfare of the inmate or the facility or both." Significantly, the ICC recommendation at plaintiff's segregation hearing contained a recommendation for transfer and "continued administrative segregation pending such transfer" based on the "best interest of both the institution and the inmate."

DGL # 861.1(b)(2) states that "Segregation is not a disciplinary measure but a means of preventive control." Subsection (3) goes on to state "Inmates assigned to segregation *ordinarily* include inmates presenting chronic behavior problems or those who present a serious threat to themselves or to others." (emphasis added.) The use of the term "ordinarily" undermines plaintiff's argument that the Virginia Guidelines have created particularized substantive limitations on Virginia prison officials' discretion to place an inmate in administrative segregation. DGL # 861.1 makes it clear that the standards concerning inmates with "chronic behavior problems or those who present a serious threat to themselves or to others" are a general guideline to assist officials in exercising their discretion. They do not constitute limiting conditions; the discretion of the decision maker is the limiting condition. It is the opinion of the Court that the Virginia

Division Guidelines in effect on 6 November 1981, did not create a substantive liberty interest in plaintiff from being placed in administrative segregation. Therefore, summary judgment shall be GRANTED to the defendants on this issue.

■ Addressing the issue of plaintiff's transfer, DGL # 821 IX(B) and VIII(I)(1)(b) establish mandatory procedures and CCB review whenever there is an administrative request to transfer an inmate who poses a security threat. Guideline # 825(B), however, states that "an inmate *may* be referred administratively to an Institutional Classification Committee for transfer consideration in the manner described in DGL # 821." (emphasis added.) In addition to this non-mandatory language in DGL # 825, § 53.1–21 of the Va.Code establishes an overall policy of unfettered discretion regarding inter-institutional inmate transfers.[3] Under the Virginia Guidelines, the CCB may transfer an inmate from one institution to another within the Commonwealth for any reason or for no reason at all. The fact that certain procedures must be afforded an inmate before he is transferred does not create a due process liberty interest. *Olim* at 243, 103 S.Ct. at 1744, 75 L.Ed.2d at 819.

Following the specific language mandated by the remand from the Court of Appeals, this Court's inquiry would normally be concluded upon the finding that the Virginia Division Guidelines in effect on 6 November 1981 did not create a liberty interest cognizable under the Due Process Clause. Acknowledging that the issue of the creation of due process liberty interests through State administrative regulations is still an unsettled area of law, I wish to note that, absent the Fourth Circuit's specific mandate, this Court would have followed a more expedient analysis by assuming a liberty interest *arguendo* and proceeding to address the ultimate issue of whether or not the plaintiff received all the procedural protections mandated by the Due Process Clause.

■ While a State may create substantive rights of such import that they are entitled to protection under the Due Process Clause, this does not mean that all procedures erected by the State to protect such rights are thereby transformed into constitutional imperatives under the Fourteenth Amendment itself. *Hewitt v. Helms*, 459 U.S. at 475, 103 S.Ct. at 874, 74 L.Ed.2d at 691. *Durkin v. Taylor*, 444 F.Supp. 879, 889, fn. 14 (E.D.Va.1977).

Where a State creates a protected liberty interest through administrative guidelines, due process is satisfied where an inmate is afforded:

"... an informal, non-adversary, evidentiary review ... an inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation. Ordinarily, a written statement by the inmate will establish this purpose ... so long as this occurs, and the decision maker reviews the charges and then-available evidence against the prisoner, the Due Process Clause is satisfied."

*Hewitt* 459 U.S. at 476, 103 S.Ct. at 874, 74 L.Ed.2d at 691.

■ The uncontroverted facts in this case reveal that plaintiff received notice of his formal ICC hearing, and that he attended the hearing. That the hearing was meaningful is evidenced by the fact that plaintiff was successful in dissuading the Committee from increasing his security classification. Although the ICC was not convinced that the information that plaintiff was planning an escape was absolute

---

**3.** *Statute § 53.1–21* —Transfer of prisoners into and between state and local correctional facilities.

 A. Any person who (1) is accused or convicted of an offense (a) in violation of any county, city or town ordinance within the Commonwealth, (b) against the laws of the Com-

monwealth or (c) against the laws of any other state or county, or (2) is a witness held in any case in which the Commonwealth is a party and who is confined in a state or local correctional facility, may be transferred by the Director to any other state or local correctional facility which he may designate.

"truth," they believed that the information raised a "reasonable suspicion" of such activities. On the basis of that suspicion, and in conjunction with plaintiff's hostile attitude, the ICC recommended transfer to Powhatan Correctional Center. On the basis of this information the CCB, the ultimate decision maker, approved plaintiff's transfer on 25 November 1981, less than three weeks after plaintiff's formal ICC hearing. On these facts, it is clear that plaintiff received all the procedural protections mandated by the Due Process Clause. Accordingly, summary judgment shall be GRANTED for defendants.

Should plaintiff desire to appeal, written notice of appeal must be filed with the Clerk of the Court within 30 days of the entry hereof.

An appropriate judgment shall issue.

## APPENDIX A

### Division Guidelines # 821

#### # 821 V. *Function of the Institutional Classification Committee*

An essential element in the classification process is the Institutional Classification Committee which functions as an extension of the institution administration and exerts control over the continuing development and management of the offender's correctional program. The Institutional Classification Committee has responsibility for the following:

1. Approval and revision of Specific Inmate Program Objectives and Plans
 c. Recommend inmate custody change and institutional transfers to Central Classification Board

# 821 VIII. G. Institutional Classification Committee Meeting Procedure:

It is imperative that classification hearings be conducted uniformly in accordance with established procedure and that all decisions rendered by the Institutional Classification Committee are based on reliable information and sound reasoning.

# 821 VIII. I. Approval of Institutional Classification Committee Actions:

1. Types of actions which require Central Classification Board approval:

 a. All custody change recommendations as well as the assignment of and release from segregation status

 b. All institutional transfer recommendations

# 821 VIII. J. Appeal Procedures:

2. Central Classification Board Level Decisions: The institution or unit superintendent may appeal the decisions of the Central Classification Board to the Assistant Director in charge of Classification and Records through their respective Associate Directors in charge of Major Institutions and Field Unit Institutions. In the case of field unit institutions, such appeals must be routed through the respective Regional Superintendents.

All appeals of Central Classification Board decisions must be submitted in writing and include a specific, detailed justification as to why the Central Board's decision should be amended. The Associate Directors in charge of Major Institutions and Field Unit Institutions may deny appeals stating the reasons for such actions in the absence of input from Classification and Records. Appeals which in the judgment of the respective Associate Directors merit further consideration will be forwarded to the Assistant Director in charge of Classification and Records for final disposition. The Assistant Director's final disposition will be communicated in writing to the respective Associate Directors for dissemination to the respective institution or unit superintendent.

3. Inmate Appeals: Inmates may appeal the decision of the Institutional Classification Committee and/or Central Classification Board to the Director by submitting a grievance through the established grievance procedure at their assigned institution.

# 821 IX. B. Formal Classification Hearings:

1. Definition: Formal Classification Hearings are defined as those inmate case reviews conducted by the Institutional Classification Committee which require at a minimum prior notification to the inmate and the inmate's presence during review proceedings in addition to other procedural safeguards identified in this section.

2. Types of classification actions which require Formal Classification Hearings:

 c. Assignment and review of segregation status

 d. Institutional transfers which are based on any of the following:

 (1) Documented Adjustment Committee reports

 (2) Information reported at the institution by the correctional staff and/or reliable inmate sources which tends to indicate that a given inmate(s) presents a serious threat to the institution's security.

 (3) Pending criminal charges

3. Procedural Requirements:

 The inmate will:

 a. receive written notification of the hearing a minimum of forty-eight (48) hours in advance stating the reasons for and purpose of the review.

 b. be given an opportunity to appear before and address the Committee.

 c. be allowed to remain silent.

 d. have an institutional counselor or other institutional employee present to assist him.

 Note: Inmates *will not* be permitted to have employed legal counsel present during formal classification proceedings.

 * e. be permitted to hear the reporting officer's testimony. A signed and notarized statement from the reporting officer will suffice in the reporting officer's absence. Additionally, a ranking treatment or custodial official who is thoroughly familiar with the facts surrounding a given case may appear before the Institutional Classification Committee in the absence of the reporting officer.

 * f. be permitted to call and cross-examine voluntary witnesses and cross-examine adverse witnesses.

 g. be advised verbally during the Committee's proceedings and in writing within two working days following the hearing as to the Committee's recommendations and the rationale for the same.

 h. receive within a reasonable period of time a copy of the Committee's written findings and recommendations reflecting the unit or institution superintendent's action and that of the Central Classification Board where the latter is required.

 * Note: Requirement e., above, does not apply in the case of those hearings which are based on documented Adjustment Committee Reports. Requirement f., above, applies *only* in the case of those hearings which are based on information reported at the institution which tends to indicate that the inmate presents a serious threat to the institution's security. In such cases, the person referring the inmate to the Institutional Classification Committee must appear before the Committee in the presence of the inmate and state the reason(s) for the referral.

 In those cases where information concerned was reported at other units or institutions, the officer requesting reclassification will familiarize himself with those incidents and appear in place of the reporting officer(s) before the Institutional Classification Committee to be examined.

 Where voluntary witnesses (inmate) are assigned to another institution or field unit, the Institutional Classification Committee must provide some means for taking a statement from that witness by either counselors or supervisory personnel.

The Institutional Classification Committee may limit the number of voluntary witnesses to those the Committee considers reasonably necessary. The Committee may limit repetitive and irrelevant testimony.

#821 IX. C. Form—Notification of Referral to Institutional Classification Committee—See Appendix C

In *all* formal hearings conducted by the Institutional Classification Committee, the inmate will be furnished a minimum of twenty-four hours in advance of the hearing with a completed "Notification of Referral to Institutional Classification Committee" indicating the reasons for and purpose of the hearing. The inmate will be required to sign this document acknowledging receipt of the same. This act must be witnessed by a sworn corrections employee. The institution superintendent or his designee will be responsible for the preparation and issuing of this notification. Copies of this notification will be placed in the inmate's institutional criminal record and attached to the CL–20 for Central Classification Board access and inclusion in the central criminal record.

#821 IX. F. Miscellaneous

At *no* time are Institutional Classification Committee proceedings to be used as a means for punishing inmates.

#821 XI. *Miscellaneous*

Within reason, every inmate assignment should be consistent with his/her established program objectives. Prescribed assignments and inmate assignment preferences must give way to space, security, and program considerations. Nowhere in the classification process is there a place for arbitrary or capricious action. Established Committees, not individuals, will make assignments. Where emergency situations exist, the institution superintendent or ranking security officer is expected to take whatever action his/her judgment dictates as necessary and essential to prevent the loss of life, bodily injury, or property damage. All such actions taken which result in a custody increase, assignment of segrega-

tion status, removal from Work/Study Release, or institutional transfer, are tentative and subject to review by an Institutional Classification Committee and the Central Classification Board.

*Division Guidelines #823*

#823 V. *Authority*

Except where otherwise specified in this Guideline, authority for *all* inmate custody assignments is vested in the Central Classification Board.

#823 VIII. C. *Assignment of and Removal from Segregation Status*

1. Definition of Terms

 a. *Segregation:* Segregation is not defined as a custody level. It is a type of housing reserved as special purpose bed assignments at major institutions and field units utilized under proper administrative process for the protective care and custodial management of inmates. Segregation is designed to provide stringent custodial control and surveillance over those prisoners who pose a serious threat and cannot exist in a general population setting. Segregation should not be confused with isolation nor is it a means to punish inmates. Additionally, segregation is not to be used as a *routine* means for handling prisoners in a given category. For example, an inmate facing pending criminal charges is not to be placed in segregation automatically, but only if the ICC feels that he will present a security threat if left in the general population.

2. All assignments to and removal from segregation status require formal ICC hearings and are subject to the review and approval of the institution superintendent. In the case of inmates assigned to segregation, all such actions require the final approval of the Central Classification Board.

 The institution superintendent, however, on the basis of ICC recommendations may effect the release of prisoners from segregation status absent Central Classification Board review and approval, provided such action

does not require or involve institutional transfers. Where possible, prisoners who are recommended for release from segregation will be reviewed by the superintendent on a same day basis and released from segregation status should the superintendent concur. Should the superintendent disapprove the ICC's action, he/she will note the reasons for this decision and forward the Committee's recommendations to the Central Classification Board for final disposition.

All ICC recommendations for *continued* confinement in segregation status will be subject to final review and approval of the Central Classification Board.

3. As described in DGL No. 861.1, "Minimum Standards for Isolation, Segregation, and Detention," a prisoner assigned segregation status will be reviewed by the assigned Management Team within forty-five calendar days from the date he was placed in segregated confinement. The Management Team has the option at this point of continuing the inmate's assignment or referring him to an Institutional Classification Committee for review and possible removal from segregation status. Within ninety calendar days from the date the prisoner was assigned segregation status, he will be reviewed again by the Management Team *and* referred with recommendations for or against release from segregation to an ICC for review. Institutional Classification Committee review observing all procedural safeguards for formal hearings outlined in DGL No. 821, "Institutional Classification Management," Section IX–B, pp. 15–17, is mandatory at this point. Should the prisoner be retained in segregation status, he will be reviewed again by the Management Team every forty-five days thereafter with optional and mandatory referral to an ICC on an alternating basis as described above until the prisoner is released from segregation status.

# 825 IV. B. *Administrative Transfer Request*

1. An inmate may be referred administratively to an Institutional Classification Committee for transfer consideration in the manner described in DGL 821, "Institutional Classification Management." (See Section VIII, E–1, pp. 8–9)

# 825 VI. C. *Institutional Classification Committee Hearing Request*

The Institutional Classification Committee hearing requirements outlined in DGL No. 821 as they apply to institutional transfers will be observed. (See DGL 821, Section IX, pp. 14–16)

# 825 VI. D.

3. On the first working day following the emergency situation, the institution or regional superintendent, will notify the Assistant Director in charge of Classification and Records or his designee of any transfer action taken. The Assistant Director in charge of Classification and Records or his designee will initiate a review of the prisoner's record at the Central Classification Board level and issue appropriate written transfer authorization which will remain in effect pending the final outcome of an Institutional Classification Committee hearing and subsequent Central Classification Board review where such is required.

4. Once a prisoner is received at an institution through temporary transfer action, he becomes the full responsibility of the receiving institution superintendent in the area of custody and care. However, it will remain incumbent upon the sending institution superintendent to assure that the necessary written forms and/or reports are completed and all Adjustment or Classification Committee hearings as required by Division Guideline are properly conducted and reported.

5. In an emergency situation, where possible, Adjustment and Classification Committee hearings, as required, will be conducted prior to initiating transfer action. Where such is not possible, the appropriate committee(s) will convene at the receiving institution.

6. Except where otherwise specified in this Guideline, all temporary emergency transfer actions will be subject to final review and approval by the Central Classification Board.

### Division Guidelines # 861.1

# 861.1 IV. B. *Segregation*

1. Segregation is a protective care and custodial management measure exercised by the institution or unit for the welfare of the inmate or the facility, or both.

2. Segregation is not a disciplinary measure but a means of preventive control.

3. Segregation is a special purpose bed assignment operated under maximum security regulations and procedures. Inmates assigned to segregation ordinarily include inmates presenting chronic behavior problems or those who present a serious threat to themselves or to others. They may be severe escape risks or seriously aggressive individuals.

# 861.1 IV. B. 5. *Segregation Program*

The inmate's behavior and attitude will be continuously observed and evaluated. Within 45 days the Institutional Treatment Team consisting of the ranking correctional officer in the Segregation Unit, the assigned counselor and one other staff member from the Segregation Unit will review the inmate's behavior and decide to keep the inmate in segregation another 45 days or refer the inmate to the ICC for possible reclassification. The ICC will hear the inmate when referred by the Treatment Team in the first 45 day period and will hear the inmate at the end of the second 45 days at the mandatory request of the Treatment Team. The Treatment Team

will document its decision and rationale and record this information in counseling file, the institutional file and, if necessary, forward a copy to the ICC. The ICC will follow the procedure set forth in the Division guideline on classification.

The Treatment Team and the ICC will make their decision on the inmate's behavior as well as progress in his treatment program plan. It must also be determined whether the inmate may be returned to the general population and if he is a threat to security or his own life may be in danger due to enemies in the general population. If the latter is true and his progress merits a new assignment, it may be possible to transfer him to another institution.

### Division Guidelines # 863

# 863 I. *Purpose*—Occasionally, situations arise where it is necessary to transfer an inmate from segregation at one institution to segregation at another institution.

This will usually involve a situation where a particular inmate is a serious and present threat to discipline or security in the segregation area or where his life is in imminent danger from other inmates. In such cases it is imperative that transfers be immediately effected for the safety of the institution or the inmate.

II. *Administration*—When a situation arises where the superintendent of the institution feels that a situation might exist where an immediate transfer should be made in order to protect the life of an inmate or to preserve the discipline and security of the segregation facility, a full oral report, which shall include consideration of the conditions at the segregation unit of the proposed receiving facility, shall be rendered immediately by telephone to the Assistant Director of the Division of Institutional Services requesting that the transfer be made.

The Regional Administrator acting for the Assistant Director of the Division of Institutional Services shall approve

1132

or disapprove the transfer, based on oral information furnished by the institutional superintendent.

In the event that the Assistant Director for Security or the Director of the Division of Corrections cannot be contacted, the transfer may be made upon mutual agreement of the two superintendents, subject to final review and approval by the Assistant Director of Security as soon as he may be contacted. All action, including the report of the investigation, shall be, as soon as possible, reduced to writing and signed by the appropriate staff members.