Lawrence PAOLI, Jr.

v.

Robert LALLY, etc., et al.

Lawrence PAOLI, Jr.

v.

Edwin R. GOODLANDER, etc., et al.

Lawrence PAOLI, Jr.

v.

William J. KUNKEL, etc.

Civ. Nos. K–74–476, K–80–2921 and K–83–3305.

United States District Court, D. Maryland.

May 23, 1986.

**1254**

John H. West, III, Pamela J. White, and Ober, Kaler, Grimes & Shriver, Baltimore, for plaintiff.

Stephen H. Sachs, Atty. Gen., and Deborah K. Chasanow, and Stephanie J. Lane, Asst. Attys. Gen., for defendants.

FRANK A. KAUFMAN, District Judge.

In April 1966, Lawrence Paoli, Jr. was sentenced in the Criminal Court for Baltimore City, Maryland to eighteen (18) concurrent life sentences after pleas of guilty and convictions after trial, upon ten (10) charges of rape, and eight (8) charges of intent to rape.[1] From that time until now, Paoli has been incarcerated within the correctional system of the State of Maryland. At all times during those years, Paoli has been the only inmate in that system serving eighteen (18) concurrent life sentences.[2] Paoli suffers from a physiological defect which, the parties agree, gave rise to his criminal behavior. He has a testosterone level approximately twice that of a normal male. In 1974, Paoli, then confined in the Maryland Penitentiary, filed a lawsuit in this Court, Civil No. K–74–476, seeking to obtain experimental treatment by use of the drug, Depo-Provera, which lowers testosterone levels and thus decreases sexual behavior. In May 1975, this Court, with the agreement of Paoli and the appropriate officials of the State of Maryland and of Johns Hopkins Hospital,[3] ordered that Paoli receive Depo-Provera and psychotherapy treatments to be administered to him at the Maryland Penitentiary by medical personnel of the Johns Hopkins Hospital acting within a program directed by Drs. John Money and Fred Berlin. Depo-Provera is administered by injection. A single injection remains effective for seven (7) days. Since 1975 and to and including the date of

---

1. The parties have entered into very substantial stipulations of material facts herein. To the extent there are disputes concerning material facts, this Court in this opinion has resolved them in favor of plaintiff. *See* Plaintiff's Proposed and Agreed Stipulations (Sept. 7, 1984) [hereinafter cited as Plaintiff's Stipulations]; Defendants' Proposed and Agreed Stipulations (Sept. 7, 1984) [hereinafter cited as Defendants' Stipulations].

2. Defendants' Stipulations ¶ 22.

3. As to the extent to which a prison inmate has a constitutional right to psychological and psychiatric treatment, *see Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir.1977). It is to be noted that Paoli is seemingly the only inmate who has ever been treated with injections of that drug.

this opinion, weekly injections of the drug have been so administered to Paoli. The results have been dramatic. Paoli now looks and behaves like a far different person than he seemed to be when he appeared in this Court in 1975.

Because some patients fail to comply with treatment schedules, a report by the Office of Psychohormonal Research at the Johns Hopkins University School of Medicine states that "it is imperative that there be strict, failsafe supervision of the patient, should he eventually leave the prison system, regarding compliance in obtaining treatment, until such time as it is legally terminable."[4] No expert has been able to state to Commissioner Goodlander or, seemingly, to anyone else that if plaintiff should fail to obtain treatments he would not revert to antisocial sexual behavior.[5]

In August 1977 plaintiff was recommended by a classification team and the Maryland Penitentiary warden for transfer from that maximum security institution to a minimum security facility. In November 1977, the Maryland Parole Commission, though it denied Paoli's application for parole, also recommended that he be placed in a minimum security facility, and set a parole rehearing for November 1980. At first, Paoli's recommended transfer to a minimum security facility was denied by Maryland's Commissioner of Corrections. However, subsequently, that official approved Paoli's transfer to medium security at the Maryland Correctional Training Center (MCTC), and that transfer was effected on February 24, 1978. In April 1979 plaintiff was recommended by a classification team at MCTC for transfer to minimum security. However, that recommendation was denied by the MCTC warden. In August 1979 another classification team again recommended that plaintiff be transferred to a minimum security facility, namely, the Emergency Housing Unit (EHU). The MCTC warden approved that recommendation and also approved an additional recommendation that Paoli be considered for admission to the Maryland Pre-Release System. On August 22, 1979, plaintiff was moved from MCTC to EHU. The following day, Maryland's then Commissioner of Corrections, Edwin R. Goodlander, ordered Paoli's immediate return to MCTC pending a final classification review and decision in plaintiff's case by the Commissioner's office.

Following plaintiff's return to MCTC Commissioner Goodlander continued (or began) a review of plaintiff's file. Following that review, and another recommendation by a classification team at MCTC that plaintiff be assigned to a minimum security facility, Commissioner Goodlander denied the recommended transfer in July 1980. Since 1978 plaintiff's prison file has contained a notice or "flag" indicating that the Commissioner was to be notified before plaintiff is transferred to a less than medium security facility.[6]

In November 1980, the Parole Commission, after affording plaintiff a hearing, denied parole to plaintiff and did not set a rehearing date. In 1982 or 1983 the Commissioner of Corrections (then Jon Galley) recommended that the plaintiff be given a rehearing date. In January 1983, the Chairman of Maryland's Parole Commission, William Kunkel, and the other members of that commission, decided not to set a rehearing date. Nevertheless, subsequent to that decision, the Parole Commission did in fact set a hearing for February 1984. That hearing was held and parole again denied to Paoli. Another rehearing was at that time scheduled for 1992.

Plaintiff was transferred to the Patuxent Institution[7] for evaluation in November 1981. In March 1982 it was determined that the Patuxent program was not suit-

---

**4.** Defendants' Stipulations ¶¶ 19–20.

**5.** Defendants' Stipulations ¶ 16–17.

**6.** Defendant's Stipulations ¶¶ 10–12, 21.

**7.** The Patuxent Institution is a facility within the Maryland correctional system, the "purpose" of which "is to provide efficient and adequate programs and services for the treatment and rehabilitation of eligible persons." Md.Ann.Code art. 31B, § 2(b).

able for plaintiff; thereupon, he was transferred back to the Maryland Penitentiary, where plaintiff is presently incarcerated.[8] Other than the 1992 parole rehearing there are no further prison administrative or parole proceedings contemplated at the present time in connection with Paoli.

In 1980 Paoli filed Civil No. K–80–2921 against then Commissioner Goodlander under 42 U.S.C. § 1983, alleging violations of his due process, equal protection and Eighth Amendment rights, and seeking compensatory and punitive damages, an injunction requiring his placement in a minimum security facility, and declaratory relief. That suit originally named Goodlander as a defendant in both his individual capacity and in his official capacity as Commissioner of the Maryland Division of Correction; by stipulation among the parties, that suit continues against former Commissioner Goodlander as defendant in his individual capacity and present Commissioner Arnold J. Hopkins as defendant in his official capacity.

In 1983 plaintiff filed a second lawsuit, Civil No. K–83–3305, under section 1983, against William Kunkel, Chairman of the Maryland Parole Commission, alleging that the Parole Commission violated plaintiff's due process, equal protection, and Eighth Amendment rights by failing appropriately to schedule a parole rehearing following a denial of parole. In Civil No. K–83–3305, plaintiff seeks compensatory damages, an injunction requiring a parole rehearing, and declaratory relief.

On October 23, 1984, this Court consolidated the said two cases, i.e., Civil Nos. K–80–2921 and K–83–3305, along with plaintiff's earlier case, Civil No. K–74–476. Presently pending are cross-motions for summary judgment filed by both sides in both Civil Nos. K–80–2921 and K–83–3305. Summary judgment "should be granted only where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the

application of the law." *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir.1950). The issues posed in the within cases, however, are legal and not factual. Indeed, as noted, *supra* note 1, the parties have entered into substantial stipulations of material facts. Accordingly, for the reasons set forth in this opinion, this Court will enter an order granting summary judgment as to all defendants and denying the summary judgment motions of plaintiff in these consolidated cases.

## I. CLASSIFICATION

In Civil No. K–80–2921 Paoli claims that Commissioner Goodlander's action in transferring Paoli back to the MCTC in August 1979 and Goodlander's July 1980 denial of minimum security classification for Paoli violated Paoli's due process, equal protection, and Eighth Amendment rights.

### A. *Due Process*

A "convicted felon does not forfeit all constitutional protections by reason of his conviction and confinement in prison." *Meachum v. Fano*, 427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976). The Supreme Court has considered the constitutional rights of prisoners in a number of decisions and has "consistently refused to recognize more than the most basic liberty interests in prisoners," *Hewitt v. Helms*, 459 U.S. 460, 467, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983), and has also established that, in most instances, the Due Process Clause does not, in and of itself, create any liberty interest against transfers of a prisoner from one facility to another.

In *Vitek v. Jones*, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980), the prisoner was transferred from a prison to a mental institution. Justice White wrote that "changes in the conditions of confinement having a substantial adverse impact on the prisoner are not alone sufficient to invoke the protections of the Due Process Clause '[a]s long as the conditions or degree of

---

**8.** When he has been confined elsewhere than the Maryland Penitentiary, Paoli has been transported to the Penitentiary for his regularly scheduled Depo-Provera treatments by Johns Hopkins medical personnel.

confinement to which the prisoner is subjected is within the sentence imposed upon him.' *Montanye v. Haymes*, 427 U.S. [236], at 242, 96 S.Ct. [2543], at 2547 [49 L.Ed.2d 466]." *Id.* at 493, 100 S.Ct. at 1264. Concluding "that involuntary commitment to a mental hospital is not within the range of confinement to which a prison sentence subjects an individual," *id.*, Justice White held that the transfer "implicated a liberty interest protected by the Due Process Clause." *Id.* at 494, 100 S.Ct. at .1264.

Other Supreme Court decisions, both prior and subsequent to *Vitek*, make it clear that a transfer to a prison facility of greater security does not by itself implicate any right inherent in the Due Process Clause, and that a liberty interest does not exist in connection with such a transfer in the absence of a state statute or regulation that creates such an interest.[9] *See Meachum, supra*, in which the plaintiffs were transferred from a medium security facility to other facilities, including maximum security facilities. Justice White held that "the Due Process Clause [does not] in and of itself protect a duly convicted prisoner against transfer from one institution to another with the state prison system." 427 U.S. at 225, 96 S.Ct. at 2538.[10] *Cf. Olim v. Wakinekona*, 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983), in which Justice Blackmun, relying in part on *Meachum*, held that "an interstate prison transfer, including one from Hawaii to California, does not deprive an inmate of any liberty interest protected by the Due Process Clause itself." *Id.* at 248, 103 S.Ct. at 1747.

In *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), Chief Justice Burger considered the due process rights of prisoners in connection with eligibility for parole. In a prior case, *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), the Chief Justice had held that a parole revocation decision implicated protected due process rights. In *Greenholtz*, he stated that no liberty interest was created by the Due Process Clause itself in connection with a parole release determination, and distinguished the prior *Morrissey* decision. *See Greenholtz*, 442 U.S. at 8–11, 99 S.Ct. at 2104–2105. However, the Nebraska statute at issue in *Greenholtz* required that "whenever the [Nebraska] Board of Parole considers the release of a committed offender who is eligible for release on parole, it *shall* order his release *unless* it is of the opinion that his release should be deferred because" of one or more statutory factors. *Id.* at 11, 99 S.Ct. at 2105 (emphasis added). In light of that statute, Chief Justice Burger observed:

> Respondents emphasize that the structure of the provision, together with the use of the word "shall" binds the Board of Parole to release an inmate unless any one of the four specifically designated reasons are found. In their view, the statute creates a presumption that parole release will be granted, and that this in turn creates a legitimate expectation of release absent the requisite finding that one of the justifications for deferral exists.... We can accept respondent's view that the expectancy of release provided in this statute is entitled to some

---

**9.** For a discussion of these legal principles, *see* Herman, The New Liberty: The Procedural Due Process Rights of Prisoners and Others under the Burger Court, 59 N.Y.U.L.Rev. 482 (1984); Casenote, The Procedural Due Process Implications of Involuntary State Prisoner Transfers: *Hewitt v. Helms* and *Olim v. Wakinekona*, 25 B.C.L.Rev. 1087 (1984).

**10.** In *Meachum, supra*, Justice White wrote that "transfer [of prisoners] in a wide variety of circumstances is vested in prison officials." 427 U.S. at 227, 96 S.Ct. at 2539–2540. Massachu-

setts law, in fact, placed virtually no limits on prison officials' discretion. *See id.* at 227 n. 7, 96 S.Ct. at 2539 n. 7 (quoting applicable statutes). Justice White therefore concluded that "[w]hatever expectation the prisoner may have in remaining at a particular prison, so long as he behaves himself, it is too ephemeral and insubstantial to trigger procedural due process protections so long as prison officials have discretion to transfer him for whatever reason or no reason at all." *Id.* at 228, 96 S.Ct. at 2540.

measure of constitutional protection. However, we emphasize that this statute has unique structure and language and thus whether any other state statute provides a protectible entitlement must be decided on a case by case basis.

*Id.* at 11–12, 99 S.Ct. at 2105–06.

*Greenholtz* produced some confusion in the lower courts.[11] A number of courts focused on the "shall ... unless" language of the Nebraska statute at issue in *Greenholtz* to reject claims of liberty interests in the absence of such language.[12] However, in *Winsett v. McGinnes,* 617 F.2d 996 (3d Cir.1980), *cert. denied,* 449 U.S. 1093, 101 S.Ct. 891, 66 L.Ed.2d 822 (1981), Judge Rosenn held that the Delaware work release program gave rise to a protected liberty interest despite the seeming absence of the "shall ... unless" formulation, and wrote:

In Delaware, there are specific criteria for work release which we believe if met, give rise to a liberty interest in work release. Although discretion is vested in the prison authorities to grant or deny work release, that discretion must be exercised consistently with the purpose and policy behind work release. We hold that a state-created liberty interest in work release arises when a prisoner meets all eligibility requirements under the state regulations and the exercise of the prison authorities' discretion is consistent with work release policy. We conclude that Winsett had a protectible liberty interest in work release because he met all eligibility criteria under the Delaware regulations and the considerations influencing the discretionary denial of work release, namely concern for public reaction and fear of legislative reprisals, were outside the legitimate bounds of the prison officials' discretionary power. In other words, had they acted within the permissible scope of their discretion, Winsett would have been granted work release. To hold otherwise, would mean that the state-created interest in work release for eligible prisoners could be overriden simply by the prison officials' abuse of discretion. We therefore conclude that Winsett had a liberty interest protectible under the fourteenth amendment's guarantee of due process.

*Id.* at 1007. In dissent, Judge Weis, focusing on the lack of mandatory language in the Delaware statute, noted that a number of courts had placed great emphasis on the "shall ... unless" formulation, and concluded that the absence of such language in the Delaware statute was dispositive. *Id.* at 1012–13. Justice White, writing for himself and Justice Rehnquist, dissented from the Supreme Court's denial of certiorari in *Winsett,* observing:

Since Delaware prison officials do not have unlimited discretion to deny work release to an inmate who meets the basic criteria for eligibility, the Court of Appeals held that under Greenholtz respondent had established an "expectancy of [work] release" that was entitled to constitutional protection. The court clearly rejected the view expressed in the dissenting opinion that respondent could not prevail under the standard established in Greenholtz since Delaware law does not provide that an eligible inmate *shall* be granted work release *unless* prison authorities determine, based on certain statutory criteria, that work release ought to be denied.

We did not expressly state in Greenholtz that the "shall ... unless" lan-

11. In *Brandon v. District of Columbia Board of Parole,* 734 F.2d 56 (D.C.Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 811, 83 L.Ed.2d 804 (1985), Judge Mikva observed that "[s]ince *Greenholtz,* lower courts have struggled to determine whether a parole statute must be drafted in this shall/unless formulation to create a liberty interest in parole, or whether instead a statute that makes parole decisions less than wholly discretionary suffices to create such an interest." *Id.* at 61 (citing cases). Judge Mikva

declined to express a view on the merits of that question, remanding the case to the district court for further findings. *Id.* at 62.

12. *See e.g. Pugilese v. Nelson,* 617 F.2d 916, 922–25 (2d Cir.1980); *Wagner v. Gilligan,* 609 F.2d 866, 867 (6th Cir.1979); *Boothe v. Hammock,* 605 F.2d 661, 663–65 (2d Cir.1979); *Shirley v. Chestnut,* 603 F.2d 805, 807 (10th Cir.1979).

guage of the Nebraska statute was the critical factor underlying our determination that the statute created a liberty interest. However other Courts of Appeals have examined parole release statutes lacking mandatory language and have concluded in light of Greenholtz that those statutes do not create liberty interests. See *Wagner v. Gilligan,* 609 F.2d 866 (CA6 1979); *Boothe v. Hammock,* 605 F.2d 661 (CA2 1979); *Shirley v. Chestnut,* 603 F.2d 805 (CA10 1979).

I believe this Court should grant certiorari to clarify the implications of the Greenholtz decision by considering whether the Delaware statute and regulations involved in this case created a constitutionally protected liberty interest.

*Anderson v. Winsett,* 449 U.S. 1093, 1095–96, 101 S.Ct. 891, 892, 66 L.Ed.2d 822, 823–24 (1981) (footnote omitted). In *Winsett,* "[t]he Chief Justice would [have] grant[ed] certiorari and reverse[d] the judgment summarily." *Id.* 449 U.S. at 1096, 101 S.Ct. at 892, 66 L.Ed.2d at 824.[13]

In *Connecticut Board of Pardons v. Dumschat,* 452 U.S. 458, 101 S.Ct. 2460, 69 L.Ed.2d 158 (1981), Chief Justice Burger further considered the question of how liberty interests in prisoners are created and addressed the issue of "whether the fact

that the Connecticut Board of Pardons has granted approximately three-fourths of the applications for commutation of life sentences creates a constitutional 'liberty interest' or 'entitlement' in life-term inmates so as to require that Board to explain its reasons for denial of an application for commutation." *Id.* at 459, 101 S.Ct. at 2462. Answering that question in the negative, the Chief Justice wrote: "No matter how frequently a particular form of clemency has been granted, the statistical probabilities standing alone generate no constitutional protections...." *Id.* at 465, 101 S.Ct. at 2465. Noting that the Connecticut statute imposed no standards on the Board's discretion, the Chief Justice added:

This contrasts dramatically with the Nebraska statutory procedures in *Greenholtz,* which expressly mandated that the Nebraska Board of Parole "shall" order the inmate's release "unless" it decided that one of four specified reasons for denial was applicable. 442 U.S. [1], at 11, 96 S.Ct. [2100], at 2106 [60 L.Ed.2d 668]. The Connecticut commutation statute, having no definitions, no criteria, and no mandated "shalls," creates no analogous duty or constitutional entitlement.

It is clear that the requirement for articulating reasons for denial of parole

---

**13.** In *Baumann v. Arizona Dept. of Corrections,* 754 F.2d 841 (9th Cir.1985), Judge Wright concluded:

> We are persuaded that the unique "shall/unless" formula of the Nebraska statute was decisive in *Greenholtz. Boothe v. Hammock,* 605 F.2d 661, 664 (2d Cir.1979). No protected entitlement to release exists unless a state scheme includes that formula. *Id.* Guidelines used to structure the exercise of discretion in making release decisions do not create a protected interest. *Id.* Accordingly, this Circuit joins the majority of other circuits that endorse a restrictive interpretation of *Greenholtz. E.g., Slocum v. Georgia State Board of Pardons & Paroles,* 678 F.2d 940, 941 (11th Cir.), *cert. denied,* 459 U.S. 1043, 103 S.Ct. 462, 74 L.Ed.2d 612 (1982); *Candelaria v. Griffin,* 641 F.2d 868, 869–70 (10th Cir. 1981) (citing cases); *Williams v. Briscoe,* 641 F.2d 274, 277 (5th Cir.), *cert. denied,* 454 U.S. 854, 102 S.Ct. 299, 70 L.Ed.2d 147 (1981). *See generally Brandon v. District of Columbia Board of Parole,* 734 F.2d 56, 61–62 (D.C.Cir.

1984), *cert. denied,* — U.S. ——, 105 S.Ct. 811, 83 L.Ed.2d 804 (1985) (noting circuit conflict, declining to choose sides).

> Baumann asserts that *Winsett v. McGinnes,* 617 F.2d 996 (3d Cir.1980), *cert. denied,* 449 U.S. 1093, 101 S.Ct. 891, 66 L.Ed.2d 822 (1981), controls the disposition of this case. There, the Third Circuit held that guidelines setting out the goals of prison programs established perimeters limiting the exercise of officials' discretion. *Id.* at 1006–07. The court reasoned that a liberty interest arises when a prisoner meets the work release eligibility requirements and release would be consistent with established work release policy. *Id.* at 1007. We reject the Third Circuit's reasoning in *Winsett.*

*Id.* at 844–45. For a critical commentary on *Winsett, see* Case Comment, Granting Work Release: State-Created Rights to Procedural Due Process, 18 Am.Crim.L.Rev. 493 (1981), concluding "that *Winsett* was wrongly decided." *Id.* at 495.

in Greenholtz derived from unique mandates of the Nebraska statutes. Thus, although we noted that under the terms of the Nebraska statute, the inmates' expectation of parole release "is entilted to some measure of constitutional protection," we emphasized that

"this statute has unique structure and language and thus whether any other state statute provides a protectible entitlement must be decided on a case-by-case basis." Id., at 12, 99 S.Ct., at 2106 [60 L.Ed.2d 668].

*Id.* at 466, 101 S.Ct. at 2465.

In *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), the plaintiff was confined in administrative segregation following a prison insurrection. Discussing, *inter alia, Greenholtz* and *Meachum*, Justice Rehnquist, after seemingly cautioning lower courts not routinely to find liberty interests in the prison context, nonetheless concluded that the Pennsylvania regulations in question in *Hewitt* did create a liberty interest, *see id.* at 470–71, 103 S.Ct. at 870–71, and wrote:

Respondent seems to suggest that the mere fact that Pennsylvania has created a careful procedural structure to regulate the use of administrative segregation indicates the existence of a protected liberty interest. We cannot agree. The creation of procedural guidelines to channel the decision-making of prison officials is, in the view of many experts in the field, a salutary development. It would be ironic to hold that when a State embarks on such desirable experimentation it thereby opens the door to scrutiny by the federal courts, while States that choose not to adopt such procedural provisions entirely avoid the strictures of the Due Process Clause. The adoption of such procedural guidelines, without more, suggests that it is these restrictions alone, and not those federal courts might also impose under the Fourteenth Amendment, that the State chose to require.

Nonetheless, in this case the Commonwealth has gone beyond simple procedural guidelines. It has used language of an unmistakably mandatory character, requiring that certain procedures "shall," "will," or "must" be employed ... and that administrative segregation will not occur absent specified substantive predicates—viz., "the need for control," or "the threat of a serious disturbance." Petitioners argue, with considerable force, that these terms must be read in light of the fact that the decision whether to confine an inmate to administrative segregation is largely predictive, and therefore that it is not likely that the State meant to create binding requirements. But on balance we are persuaded that the repeated use of explicitly mandatory language in connection with requiring specific substantive predicates demands a conclusion that the State has created a protected liberty interest.

*Id.* at 471–72, 103 S.Ct. at 871 (footnote omitted). *Hewitt*'s emphasis on the mandatory nature of the language of the Pennsylvania's regulations thus seemingly supports the holdings of those federal courts which have placed great emphasis on the "shall ... unless" formulation.

In *Olim v. Wakinekona*, 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983), Justice Blackmun determined that Hawaii's prison statutes and regulations did not create a liberty interest requiring due process protections for a prisoner transferred from a state prison in Hawaii to a state prison in California. In *Olim*, the Hawaii regulations at issue established a "Program Committee" to make recommendations to the Administrator of the prison system. The Administrator could accept or reject such recommendations. Plaintiff objected that the Committee which recommended that he be transferred to the mainland was composed of the same persons who had held a prior disciplinary hearing involving him. Rejecting the plaintiff's contentions, Justice Blackmun wrote:

a state creates a protected liberty interest by placing substantive limitations on official discretion. An inmate must show "that particularized standards or criteria

guide the State's decision makers." ... If the decisionmaker is not "required to base its decisions on objective and defined criteria," but "can deny the requested relief for any constitutionally permissible reason or for no reason at all," ... the State has not created a constitutionally protected liberty interest.

*Id.* at 249, 103 S.Ct. at 1747.[14]

In the light of *Hewitt* and *Olim*, Judge Ervin, in *Hayes v. Thompson*, 726 F.2d 1015 (4th Cir.1984), remanded that case to the district court, writing:

> In *Hewitt v. Helms*, [459] U.S. [460], 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), the Supreme Court made clear that state statutes *and* regulations could create liberty interests if the state, in drafting its procedural guidelines, repeatedly used "explicitly mandatory language in connection with requiring specific substantive predicates...." [459] U.S. at [472], 103 S.Ct. at 871, 74 L.Ed.2d at 688. For example, in *Hewitt,* the Pennsylvania guidelines required that certain procedures "shall", "will" or "must" be employed and that actions such as administrative segregation must be preceded by specific findings such as "a threat of serious disturbance." The Supreme Court discussed the issue again in *Olim v. Wakinekona,* [461] U.S. [238], 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983). In *Olim,* the Court noted that "a State creates a protected liberty interest by placing substantive limitations on official discretion." [461] U.S. [249], 103 S.Ct. at 1747, 75 L.Ed.2d at 823.
>
> To the extent that *Cooper v. Riddle* [540 F.2d 731 (4th Cir.1976)] and *Gor-*

ham v. Hutto [667 F.2d 1146 (4th Cir. 1981)] held that prison regulations alone cannot create protected liberty interests, we find that they have been overruled by *Hewitt* and *Olim.* If the district court determines that the Virginia prison regulations explicitly place substantive limitations, as defined in *Hewitt* and *Olim,* on prison officials' discretion to transfer and otherwise discipline inmates, then it must find that [plaintiff] Kidfield Hayes has a liberty interest in being free from transfer and other disciplinary action.

*Id.* at 1017. Subsequently, in a case separate from *Hayes,* but involving the same Virginia prison regulations at issue in *Hayes,* Judge Warriner concluded that the regulations did not give rise to a protected liberty interest, interpreting them as being "a general guideline" and not a substantive limitation on discretion. *See Bartholomew v. Clawson,* 594 F.Supp. 1121, 1125–26 (E.D.Va.1984).

*Hayes* suggests that *Olim* should not be read as having reversed the emphasis on the "shall ... unless" formulation or similar mandatory language as a condition for the finding of a liberty interest. Thus, *Hayes'* approach would appear closer to Judge Wright's position in *Baumann* and to Judge Weis' dissent in *Winsett* rather than to that of Judge Rosenn's majority opinion in *Winsett,* and therefore to teach that a liberty interest is not created unless there are express—or at least very strong suggestions of—mandatory provisions in the prison statutes and regulations limiting the discretion of the prison officials.

The statutory and regulatory provisions involved in this case have apparently been

**14.** The *Hewitt* and *Olim* decisions seemingly have not fully resolved the confusion following *Greenholtz.* For example, as discussed *supra,* Judge Wright in *Baumann v. Arizona Dept. of Corrections,* 754 F.2d 841 (9th Cir.1985), concluded that the absence of the "shall ... unless" formula in the Arizona furlough regulation at issue in *Baumann* required the determination that no liberty interest was created by the regulation. *See id.* at 845. In *Lucas v. Hodges,* 730 F.2d 1493 (D.C.Cir.), vacated as moot, 738 F.2d 1392 (D.C.Cir.1984), Judge Wald wrote:

Thus the Supreme Court's recent decisions indicate that, although the existence of explicit mandatory procedural requirements may contribute to the creation of a liberty interest, such requirements are neither sufficient nor necessary.

The key to determining whether the state has created a liberty interest giving rise to a due process claim is whether it has set out substantive criteria on which the decisionmaker must base the imposition of restrictions or the withholding of benefits.

*Id.* at 1505.

subjected to judicial scrutiny on only one prior occasion. In *Washington v. Williams*, No. B–79–2111 (D.Md. Mar. 24, 1980),[15] plaintiff therein alleged that he was involuntarily transferred from the Maryland House of Correction to the Maryland Correctional Institution without being present at a hearing held by a classification team. The Inmate Grievance Commission, after holding a hearing, determined that by not permitting the plaintiff to be present at the prior hearing, the prison officials had failed to comply with the applicable regulations. *Id.* at 1. Plaintiff brought a damage action under 42 U.S.C. 1983 against the responsible officials. Judge Blair, of this Court, wrote:

> The Supreme Court has conclusively stated that in the absence of a state law or practice to the contrary, a prisoner is not entitled to a hearing when transferred from one institution to another within the state prison system. No such right exists under Maryland law, which allows for the transfer of prisoners "as the Department (of Corrections) from time to time may order." The only state procedure or practice which might be regarded as the source of the right to due process asserted by plaintiff is found in Division of Correction Regulation (D.C.R.) No. 100–1.

*Id.* at 2 (citations omitted). After analyzing the provisions of D.C.R. 100–1 and the then applicable case law, Judge Blair concluded:

> In refusing to impose a nationwide rule mandating transfer hearings, *Meachum* expressly reserved to the states the freedom "to follow another course" in the interest of "prudent prison administration." Through the promulgation of DCR 100–1 IV C, Maryland has apparently chosen to do just that. Absent any showing of an inmate's constitutional or statutory right to compliance with that procedure, however, the clear teaching of *Meachum, Montanye* and *Caceres* is that no relief is available under § 1983.

"The federal courts do not sit to supervise state prisons, the administration of which is of acute interest to the States." *Id.* at 3–4 (citations omitted). Of course, *Washington,* is distinguishable from the cases at bar. Unlike the situation in *Washington,* which addressed questions pertaining to the process by which classification team recommendations are made, these cases present questions concerning the power of the Commissioner of Corrections to review such recommendations. Moreover, in these cases there has been no determination by an Inmate Grievance Commission or any other body that Commissioner Goodlander violated the relevant regulations. Finally, a lot of constitutional "water" has "passed under the bridge" since Judge Blair's ruling in *Washington.*

The Maryland statute at issue herein provides: "The Commissioner is in sole and active charge of the Division of Correction and its several institutions and agencies, subject only to his responsibility to the Secretary of Public Safety and Correctional Services and to the Governor." Md.Ann. Code art. 27, § 674. Section 676 permits the Commissioner to adopt "reasonable rules and regulations" which "may be altered, amended or abrogated by" him. As Judge Blair noted in *Washington,* the statute also provides that inmates may be "transferred to such institutions and facilities under the jurisdiction of the Division as the Division may from time to time order...." *Id.* § 690(b). While section 690A directs that no inmate may be transferred from a maximum or medium security facility to a minimum security facility "without the participation, evaluation, review, and final approval, in each case, of the classification office of the Division of Correction," and requires the Commissioner to "promulgate rules and regulations necessary to implement the provisions of th[at] section," *id.* § 690A(a), (b), section 690A does not speak to transfers from a minimum security facility to a higher security facility or

---

**15.** A copy of the unpublished Memorandum and Order in *Washington* has been placed in the Court File in this case.

expressly oust the Commissioner from the supervisory, discretionary role created by section 674.

The purpose underlying the provisions of section 690 was "to ease the administrative burden by having prisoners assigned by one central authority," *Spillers v. State,* 10 Md.App. 643, 648, 272 A.2d 49 (1971), and "to authorize the Department [of Correction] to hold, assign and transfer prisoners among the State prisons as it deems necessary." *Mullins v. State,* 12 Md.App. 222, 224, 278 A.2d 85 (1971). Neither the express language of the statutes nor their purposes explicitly place any substantive limitations on the Division's or the Commissioner's discretion in connection with prisoner transfers.

■ Plaintiff argues that the procedures established by the Division's own regulations create such limitations. However, the mere fact that the state or its agents have created procedures does not mean that those procedures per se give rise to a protected liberty interest. *See Olim,* 461 U.S. at 250, 103 S.Ct. at 1748. Rather, it may be that such procedures serve only as guidelines for the exercise of discretion. *See id.* at 251 & n. 13, 103 S.Ct. at 1748 & n. 13. Moreover, the mere fact that the regulations may appear to create mandatory procedures does not necessarily mean that such procedures place substantive limitations upon the exercise of discretion by prison officials. *See Bartholomew,* 594 F.Supp. at 1125.

The regulations involved in these cases are D.C.R. 100–1, 100–3, 100–14, and 100–16, all of which have been in effect throughout the time period relevant herein, albeit with minor amendments from time to time. The 1977 version of D.C.R. 100–1 establishes a Classification Team in each institution. It further provides that the team "will evaluate and make recommendations in the following areas: ... (5) Transfers to equal, greater, or less [sic] security within the institution or to another institution." D.C.R. 100–1(IV)(D) (Sept. 1977). It also provides:

All recommendations of the Classification Team must be approved or disapproved by the Managing Officer.

The Managing Officer, upon review of the Team's recommendation, may agree with the recommendation or disagree with the recommendation and/or order further or new proceedings. The Managing Officer may not order an action that has not been recommended by the Classification Team.

*Id.* (IV)(E). Additionally, D.C.R. 100–1 states: "Recommendations made by the Classification Team and approved by the Managing Officer must receive final approval by the Commissioner or his designee" in certain specified areas. *Id.* (IV)(F). None of those areas is applicable to these cases. The 1980 version of D.C.R. 100–1 is substantially similar to the 1977 version.

D.C.R. 100–3, in its 1978 version, requires each institution to establish "guidelines" for selection of inmates for minimum security classification. The 1980 version is similar, but does set forth certain procedures for such selection.

D.C.R. 100–14 governs selection of inmates for minimum security camp assignment. D.C.R. 100–16 sets out procedures for transfers of inmates to institutions of greater security than that of their prior assignment.

■ Plaintiff's contention is that these regulations have created a protected liberty interest which was violated by his August 1979 transfer from EHU to MCTC and by Commissioner Goodlander's 1980 denial to Paoli of minimum security classification. In connection with the 1979 transfer, plaintiff seemingly contends that D.C.R. 100–1 called for a two-tiered review process, namely: (1) that that regulation authorized the Classification team to recommend a transfer to a lesser security facility; and (2) that approval of that recommendation by the Managing Officer, i.e., the Warden of MCTC, rendered the transfer decision final. Plaintiff points out that while in certain areas, delineated in D.C.R. 100–1(IV)(F), the Commissioner's review of classification decisions is mandated, none of

those areas is implicated in these cases. By what amounts to an argument by negative implication, plaintiff thus asserts that once the MCTC's Warden approved Paoli's transfer to EHU that transfer became final and he could only be returned to MCTC pursuant to the procedures set forth in D.C.R. 100–16, which procedures were not followed.

Defendant, on the other hand, argues that D.C.R. 100–1 creates a three-tiered review system, under which the Commissioner must review certain classification decisions, after the first two tiers of the process have been utilized, but also retains discretionary authority to review other not specifically delineated types of decisions. Thus, defendant contends that the Commissioner had discretion to intervene in Paoli's transfer, and did so in order to permit the Commissioner himself to make a final determination regarding Paoli's classification. Defendant therefore contends that D.C.R. 100–16 was never implicated and compliance with its procedures was not required.

Defendant's argument is supported by the language of the regulations. D.C.R. 100–1(IV)(E), dealing with Managing Officer's discretion, contains express limiting language. For example, it provides: "The Managing Officer may not order an action which has not been recommended by the Classification Team." Subparagraph (IV)(F) contains no language limiting the discretionary authority of the Commissioner created by section 674.

The parties have stipulated:

Former Commissioner of Correction Edwin R. Goodlander would testify that Division of Correction headquaters may, in any case, review a classification team's recommendation that an individual inmate be moved from medium security to minimum security. This view is shared by former Commissioner Mark Levine in "unusual cases", and former Commissioner Jon P. Galley.[16]

That stipulation is supported by the uncontroverted deposition testimony of both of those former Commissioners, that is, Levine and Galley. While the parties have stipulated, based on fomer Deputy Commissioner Herndon's deposition testimony, that "[n]o inmate other than Paoli has ever been transferred from EHU minimum security back to MCTC solely upon the direction of Division headquarters,"[17] they have also stipulated, based upon the deposition testimony of Herndon and Assistant Superintendent Terrie Chavis, that "Herndon did not believe that Goodlander's August 1979 intervention in the Paoli transfer was impermissible and [that] ... Chavis was not aware of any DOC regulation which prohibited headquarter's intervention in a particular classification decision."[18] The administrators' opinions are of course not binding upon this Court, though they are entitled to careful consideration, particularly since their interpretation of the regulations is either supported by or not inconsistent with the language of the statutes and regulations at issue.

As noted *supra*, the statutes place the Commissioner "in sole and active charge of the Division," Md.Ann.Code art. 27, § 674, and place no relevant limitations on the Commissioner's discretionary authority thereby created. The mere fact that the Commissioner's discretion is rarely exercised in a context such as the one in which the issues in these cases arose seemingly does not give rise to a protected liberty interest. *Cf. Dumschat,* 452 U.S. at 465, 101 S.Ct. at 2464, in which discretion was usually exercised. Nor in the applicable statutes and regulations is there any language similar to the "shall ... unless" formulation of *Greenholtz.* While the regulations expressly mandate Commissioner review of certain decisions, no language, mandatory or otherwise, limits the Commissioner's authority to review other types of classification decisions. Finally it is to be noted that D.C.R. 100–1(III) expressly states that the purpose of the regulation is

---

**16.** Defendants' Stipulations ¶ 1.

**17.** Plaintiff's Stipulations ¶ 20.

**18.** Defendants' Stipulations ¶ 2.

"[t]o provide guidance...." Accordingly, D.C.R. 100–1 does not "explicitly place substantive limitations," *see Hayes*, 726 F.2d at 1017, upon the Commissioner's authority to review and reverse classification decisions. Even were this Court to determine, which it does not, that the regulations support plaintiff's contentions herein, the negative implication plaintiff urges upon this Court, does not, in the context of the record in the within cases, rise to the level of an affirmative limitation, as suggested by *Hayes*. Under the circumstances, no constitutionally protected liberty interest was violated by the transfer of Paoli back to MCTC in August 1979.

■ The same analysis applies in large part to plaintiff's claims in connection with Goodlander's 1980 denial of minimum security classification for Paoli. Again, the mere fact that the regulations do not require the Commissioner's approval of such a decision does not mean that he was without discretion to reject the recommendation. Plaintiff claims that section 690A limits the Commissioner's authority in such instances. However, while that section refers only to the participation of the classification office of the Division, it nowhere expressly ejects the Commissioner from the decisionmaking process. As discussed *supra*, the uncontroverted deposition testimony of several former Commissioners and aides rejects the contention that the Commissioner is ejected from the decisionmaking process. Finally, it is again to be noted, the rare exercise of such discretionary authority or the fact that most prisoners recommended for reclassification are in fact transferred does not create a protected liberty interest without more. Such statistical data, in and of itself, does not rise to the required level. *See Dumschat*, 452 U.S. at 465, 101 S.Ct. at 2464.

D.C.R. 100–14(IV) provides that certain criteria must be considered in selecting inmates for minimum security assignments, but the procedures which are set forth by the regulation are otherwise phrased in nonmandatory language. At best, the regulation creates an expectation of recommendation, not an expectation that transfer will *ipso facto* follow such recommendation. The regulation merely requires consideration of certain criteria; it does not mandate transfer of inmates meeting those criteria. The existence of criteria and procedures, in and of itself, does not result in the creation of a liberty interest. *Olim*, 461 U.S. at 250–51, 103 S.Ct. at 1748. Further, the fact that certain regulations require review by the Commissioner of specified types of classification decisions does not mean that other regulations which neither require, forbid, or otherwise refer to such review, necessarily exclude the Commissioner from engaging in review of other types of classification decisions, such as the one at issue herein.

■ Paoli also contends that Commissioner Goodlander impermissibly intervened in the classification decisions for political reasons. Goodlander has acknowledged that such considerations were one factor, among many, in his decision. Plaintiff relies on *Winsett* for the proposition that *any* consideration of such factors was impermissible. In *Winsett*, Judge Rosenn concluded that the Delaware work release regulations gave rise to a protected liberty interest and did not permit consideration of political concerns, and that consideration of such factors therefore violated plaintiff's due process rights. *See Winsett*, 617 F.2d at 1007–08. However, the within litigation is distinguishable from *Winsett* on several grounds. First, the Maryland statutes and regulations create no protected liberty interest. In the absence of such an interest, the question arises as to whether a prisoner has a due process right which is violated by consideration of political factors, where such consideration is not motivated by discriminatory, arbitrary or capricious reasons. Second, the Maryland statutes and regulations do not exclude consideration of political concerns from the decisionmaking process. While D.C.R. 100–14 requires that certain criteria must be considered, it neither expressly nor implicitly prohibits consideration of other factors. Third, in *Winsett*, the state officials acknowledged

that "[h]ad it not been for this [legislative] pressure ... Winsett would have gone on work release." *Winsett,* 617 F.2d at 1002. Herein Goodlander asserts that political concerns were only one factor among many, and did not control his decision.[19] This is not a case like *Winsett* in which it can be said, as Judge Rosenn wrote in *Winsett,* 617 F.2d at 1007, that the prisoner meets "all eligibility criteria" under the statutes and regulations and is denied relief only because of "concern for public reaction and fear of legislative reprisals." Rather herein there is clearly what appears to this Court to be the obviously appropriate concern of Commissioner Goodlander that Paoli posed a danger to others if he should escape from minimum security and fail to continue to receive regularly scheduled Depo-Provera injections. In the context of Judge Wald's approach in *Lucas,* 730 F.2d at 1505, Maryland has set out no explicit substantive criteria on which the decisionmaker must base the withholding of benefits in a case—such as this one—in which the Commissioner is concerned about the possible dangers to members of the public posed by plaintiff.

Accordingly, the actions and decisions of Commissioner Goodlander of which plaintiff complains did not violate any provisions of Maryland statutes or regulations and did not contravene liberty interests, if any, established by them in favor of persons such as Paoli. Thus, Paoli's due process rights, if any, were not violated by the actions and decisions of Commissioner Goodlander challenged by Paoli in these cases.

### B. *Equal Protection*

Generally, the mere violation of state law does not state a claim under 42 U.S.C. § 1983.[20] However, "[w]here the violation of state law causes the deprivation of rights protected by the Constitution and statutes of the United States, a cause of action is stated under § 1983." *Wirth v. Surles,* 562 F.2d 319, 322 (4th Cir.1977).

In *Washington v. Williams,* No. B–79–2111 (D.Md. Mar. 24, 1980), which as noted *supra* is apparently the only decision to consider the implications of the Maryland statutes and regulations at bar, plaintiff alleged that his transfer to the Maryland Correctional Institution from the Maryland House of Correction took place without a classification hearing of the type which was normally afforded to similarly situated inmates. Judge Blair concluded that that allegation did not state a cognizable equal protection claim:

> It is at least theoretically true that plaintiff was transferred without the benefit of a classification hearing whereas similarly situated inmates would, assuming general compliance with Department regulations, be transferred only after a hearing. Uneven enforcement of a rule for purposes of harrassment may amount to a denial of equal protection. Nevertheless, the regulation allegedly disregarded is in the view of this Court merely procedural, and not a substantial provision giving rise to a sufficient "state-created right," within the meaning of *Wolff v. McDonnell,* 418 U.S. 539, 557 [94 S.Ct. 2963, 2975, 41 L.Ed.2d 935] (1974). Accordingly, no cognizable equal protection claim is raised.

*Id.* at 4.

In effect, the equal protection standard of review in a classification decision situation is simply one of whether there was a rational basis for the decision. *See Allgood v. Morris,* 724 F.2d 1098, 1100 (4th Cir.1984). In that context, "a mere inconsistency in prison management may not in itself constitute a cognizable equal protection claim." *Durso v. Rowe,* 579 F.2d 1365, 1372 (7th Cir.1978), *cert. denied,* 439 U.S. 1121, 99 S.Ct. 1033, 59 L.Ed.2d 82 (1979). Even if plaintiff was treated differently than other inmates, "[t]he defendants may

---

**19.** *See* Defendants' Stipulations ¶ 8.

**20.** *See generally Davidson v. Cannon,* —— U.S. ——, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986); *Daniels v. Williams,* —— U.S. ——, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *Ervin v. Blackwell,* 585 F.Supp. 680 (D.Mo.1983), *aff'd,* 733 F.2d 1282 (8th Cir.1984).

be able to establish the rationality of treating plaintiff differently." *Id.* A federal district court must not be "unmindful that prison officials must be accorded latitude in the administration of prison affairs, and that prisoners necessarily are subject to appropriate rules and regulations." *Cruz v. Beto,* 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972).

 Under the circumstances of the within litigation, Goodlander's actions in intervening in the Paoli classification decisions had a rational basis. Paoli was the only inmate in the custody of the Maryland Division of Correction serving 18 concurrent life sentences and the only person in such custody who was involved in the unique drug program designed to aid plaintiff and to help control his behavior. Given plaintiff's record, the parameters of the drug program, and the not unreasonably perceived lack of assurances that Paoli would remain on the drug program were he to escape or be released, the allegedly different treatment of plaintiff has not lacked a rational basis or been arbitrary or capricious. *Cf. Young v. Hunt,* 507 F.Supp. 785 (N.D.Ind.1981), in which plaintiff was denied work release status because of the assaultive nature of his offense and his history of parole violations. In rejecting plaintiff's equal protection contentions, the Court concluded: "in light of this plaintiff's historical record of parole violations it cannot be said that this decision was made in an arbitrary, capricious or discriminating manner. Thus, no cognizable equal protection claim is stated." *Id.* at 789.

Herein, Commissioner Goodlander believed that he should personally monitor Paoli's case because it was a unique case, he lacked confidence in Warden Wageley, and there was a history of special interest in Paoli's case within Division headquarters and concern in headquarters for public confidence in the Division. Prior to Commissioner Goodlander's 1980 final decision, he met or communicated with a prison psychologist, Paoli's counsel, Paoli's doctor, and the Warden of MCTC. Following those interchanges, Commissioner Goodlander reached his decision based on the lack of assurance that Paoli would not revert to antisocial behavior if Paoli failed to take part in the drug program, plaintiff's criminal record, and the risks posed if plaintiff were to be free in the community. That decision was not arbitrary or capricious, or discriminatory. Accordingly, plaintiff's equal protection claims may not succeed.

### C. *Eighth Amendment*

Plaintiff's complaint alleges that Commissioner Goodlander's actions were "done with malice, amounting to cruel and unusual punishment, causing Paoli to suffer unnecessary and wanton infliction of pain and suffering, which has caused and continues to cause Paoli permanent and irreparable harm...." [21] The Eighth Amendment "cruel and unusual" standard is based upon "the evolving standards of decency that mark the progress of a maturing society." *Rhodes v. Chapman,* 452 U.S. 337, 345–46, 101 S.Ct. 2392, 2398–99, 69 L.Ed.2d 59 (1981). Certain types of punishment may violate the Eighth Amendment's prohibitions, either under some or all circumstances. *See Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Similarly, certain types of prison conditions may violate the Eighth Amendment. *See Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981); *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

 Generally, transfers from one prison to another do not violate the Eighth Amendment. *See Virgin Islands v. Gereau,* 592 F.2d 192, 196 (3rd Cir.1979); *Sisbarro v. Warden,* 592 F.2d 1, 4 (1st Cir. 1979), *cert. denied,* 444 U.S. 849, 100 S.Ct. 99, 62 L.Ed.2d 64 (1979). However, in *Fitzharris v. Wolff,* 702 F.2d 836 (9th Cir.1983), Judge Duniway wrote: "Fitzharris alleged that if he were transferred [from the Southern Nevada Correctional Center] to the State Prison, he would be killed, and that the prison authorities knew it. *Arguably,*

---

**21.** Complaint ¶ 10, Civil No. K–80–2921 (Nov. 7, 1980).

to send him to the State Prison under these circumstances would amount to cruel and unusual punishment in violation of the Eighth Amendment." *Id.* at 839 (emphasis added). No case has been cited to this Court or found by it in which a transfer to a greater security facility in and of itself has been held to violate the Eighth Amendment.

■ In *Baumann v. Arizona Dept. of Corrections,* 754 F.2d 841, 846 (9th Cir. 1985), Judge Wright wrote:

> Baumann argues that the emotional trauma and financial injury caused by the denial of anticipated work release, along with the additional nine months of incarceration before his parole, were "torture" forbidden by the Eighth Amendment. His disappointment does not offend the standards of decency in modern society.

*Id.* at 846. Similarly, in *Allgood v. Morris,* 724 F.2d 1098 (4th Cir.1984), in which plaintiff alleged "that placement in protective segregation for someone who has not violated prison rules is a violation of the Eighth Amendment prohibition against cruel and unusual punishment," *id.* at 1101, Judge Hall, disagreeing, stated that plaintiff's "allegations of loss of recreation and canteen privileges in protective segregation can hardly be considered 'barbarous,' 'shocking to the conscience,' or contrary to 'the evolving standards of decency that mark the progress of a maturing society.' " *Id.*

Paoli's allegations herein do not rise to the level required by the Eighth Amendment. Goodlander's actions have undoubtedly disappointed and upset plaintiff, but they have not subjected Paoli to cruel and unusual punishment.

### D. *Qualified Immunity*

■ As an alternative basis for summary judgment, Goodlander contends that he is entitled to a qualified good faith immunity defense. *See Harris v. Young,* 718 F.2d 620 (4th Cir.1983), holding that a qualified immunity defense was available to the Virginia Director of Corrections.

In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), Justice Powell wrote:

> government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.
>
> Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should permit the resolution of many insubstantial claims on summary judgment. On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsuquent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful.

*Id.* at 818, 102 S.Ct. at 2738 (footnotes and citations omitted). In *Arebaugh v. Dalton,* 730 F.2d 970 (4th Cir.1984), plaintiff was transferred pursuant to the Interstate Agreement on Detainers from North Carolina to Virginia, without being afforded a prior hearing. The transfer occurred on February 2, 1981. On January 21, 1981, the Supreme Court in *Culyer v. Adams,* 449 U.S. 433, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981), had held that such transfers required a hearing before the transfer took place. Judge Murnaghan therefore held that the right was clearly established at the time of the action and that no good faith immunity defense was available to the defendants. *Arebaugh,* 730 F.2d at 972–73.

Commissioner Goodlander's actions in the within litigation took place in August of 1979 and July of 1980. The Supreme Court's decision in *Greenholtz* was handed down in May of 1979. Prior to *Greenholtz* and "after *Meachum* and *Montanye,* the extent of the liberty interest a prisoner

derived from the due process clause was unclear." Case Note, *supra*, 25 B.C.L.Rev. at 1102. Further, as discussed *supra*, the *Greenholtz* decision itself generated substantial confusion in the lower courts, with some courts holding that the "shall ... unless" formulation was dispositive and other courts holding that it was not. *Winsett*, seemingly the first case to clearly reject the "shall ... unless" formulation as dispositive, was not decided until March of 1980, and it was a split decision of another Circuit, in which, on remand, the district court granted judgment for defendants on the basis of a qualified immunity defense. *See Winsett v. McGinnes*, 617 F.2d 996 (3d Cir.1980), *cert. denied*, 449 U.S. 1093, 101 S.Ct. 891, 66 L.Ed.2d 822 (1981), *on remand*, No. 74–210 (D.Del. May 8, 1981), *aff'd without op.*, 692 F.2d 750 (3d Cir. 1982). Although *Winsett* had been decided by the time of Commissioner Goodlander's July 1980 decision, a number of contrary decisions had also been handed down by other courts. Further, no clarifying Supreme Court precedent was decided between Commissioner Goodlander's August 1979 and July 1980 decisions. The law in this regard in that time frame was surely far from clear.

**22.** Although defendant apparently has not relied on the point, plaintiff's within claim for damages against Kunkel, a state officer, apparently sued in his official capacity, is seemingly barred by the Eleventh Amendment, whether the state is a named party or not. *Scheuer v. Rhodes*, 416 U.S. 232, 237, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Because the Eleventh Amendment bars damage claims against any defendant herein who is sued in his official capacity, and because Commissioner Goodlander is seemingly the only defendant who is sued in his individual capacity, all issues concerning whether any defendant, except Goodlander in his personal capacity, is entitled to absolute or qualified immunity seemingly need not be reached herein. However, because those questions have been raised and briefed by all counsel in these cases, and because, in any event, even if Kunkel is sued herein in his individual capacity, he is at least entitled to qualified immunity, *see infra* note 23, they are discussed herein.

**23.** *Pope* was specifically cited and followed in *Franklin v. Shields*, 569 F.2d 784, 798 (4th Cir. 1977), *cert. denied*, 435 U.S. 1003, 98 S.Ct. 1659, 56 L.Ed.2d 92 (1978). The Supreme Court has not decided the issue addressed by *Pope*. *See*

Accordingly, assuming, *arguendo* only, that this Court's above stated conclusion that none of Paoli's constitutional rights were violated by Commissioner Goodlander's actions is in error, because the law governing the issues discussed *supra* was not "clearly established" at the time of Commissioner Goodlander's actions, Commissioner Goodlander would be entitled to a qualified immunity good faith defense as to plaintiff's claims against him.

## II. PAROLE

Defendant Kunkel contends that he is entitled to absolute immunity from damage claims under 42 U.S.C. § 1983 because of his position as Chairman of the Parole Commission.[22] *See Pope v. Chew*, 521 F.2d 400 (4th Cir.1975), in which plaintiff sued the Chairman and members of the Virginia Parole and Probation Board. Judge Craven wrote that plaintiff could not "recover damages. Parole Board members have been held to perform a quasi-judicial function in considering applications for parole and thus to be immune from damages in § 1983 actions." *Id.* at 405 (citations omitted).[23]

*Cleavinger v. Saxner*, —— U.S. ——, ——, 106 S.Ct. 496, 500–01, 88 L.Ed.2d 507 (1985), in which Justice Blackmun wrote:

Although this Court has not decided whether state parole officials enjoy absolute immunity as a matter of federal law, see *Martinez v. California*, 444 U.S. 277, 284 [100 S.Ct. 553, 558, 62 L.Ed.2d 481] (1980), federal appellate courts have so held. See, *e.g., Sellars v. Procunier*, 641 F.2d 1295, 1303 (CA9), cert. denied, 454 U.S. 1102 [102 S.Ct. 678, 70 L.Ed.2d 644] (1981); *Evans v. Dillahunty*, 711 F.2d 828, 830–31 (CA8 1983); *United States ex rel. Powell v. Irving*, 684 F.2d 494 (CA7 1982).

*Id.* Each of the Circuit Court decisions to which Justice Blackmun referred cited to and accord with *Pope* and/or *Franklin*. In *Cleavinger*, Justice Blackmun held that members of a state prison discipline committee were entitled only to qualified immunity. *Id.* at ——, 106 S.Ct. at 503–04. Even if qualified immunity is all that defendant Kunkel is entitled to in this case, that immunity would appear to protect him from damages under the *Harlow* standard set forth *supra*, since plaintiff has not demonstrated that defendant Kunkel violated any "clearly established" constitutional right meritoriously asserted by plaintiff herein.

■ Kunkel contends that plaintiff's requested injunctive and declaratory relief have been rendered moot by the 1984 parole hearing and the scheduling of a further hearing in 1992, even if it is assumed, *arguendo* only, that any of plaintiff's constitutional or statutory rights were violated by Kunkel. Voluntary cessation of an allegedly illegal practice does not per se render a claim moot, particularly where, as here, defendant asserts the legality of his conduct. *See Commonwealth of Virginia ex rel. Coleman v. Califano*, 631 F.2d 324, 326–27 (4th Cir.1980). However, in this case, defendant Kunkel has gone beyond mere cessation of the challenged practice, i.e., the refusal to schedule a parole hearing, since plaintiff was afforded the parole hearing he sought and also a further hearing scheduled for 1992. "A claim may become moot when the plaintiff receives the relief sought or when it is factually, not legally, impossible to receive such relief." *Liberles v. County of Cook*, 709 F.2d 1122, 1127 (7th Cir.1983). *See also* 13A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure: Jurisdiction § 3533.2 at 238–40 (2d ed. 1984).

"However, even though the injunctive relief [sought] is moot, a separate inquiry must be made regarding the declaratory relief which ... was sought." *Inmates v. Owens*, 561 F.2d 560, 562 (4th Cir.1977). In that context, there must be "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Golden v. Zwickler*, 394 U.S. 103, 108, 89 S.Ct. 956, 959–60, 22 L.Ed.2d 113 (1969). In *Owens*, Judge Hall held that the inmates' "request for declaratory relief [wa]s moot" because of "the release of all the inmates and the lack of class certification below." 561 F.2d at 562. Thus, even in a voluntary cessation case, "[m]ootness will be found ... if the

plaintiff is not likely to be affected by any repetition, or if effective relief can be provided in the event of any recurrence." 13A C. Wright, A. Miller & E. Cooper, *supra*, § 3533.6 at 333 (footnotes omitted).

This is not a case "capable of repetition, yet evading review." *Cf. Southern Pacific Terminal Co. v. Interstate Commerce Commission*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). Plaintiff has been notified that he will receive a further parole hearing in 1992. Thus, as of this date, there is no refusal by Maryland's Parole Commission to schedule a further hearing for Paoli. Nor is there any reason to believe that if Paoli is denied relief in the 1992 parole hearing another hearing will not thereafter be scheduled. Accordingly, there is no reasonable expectation of a repetition of a refusal to schedule one or more parole hearings for Paoli in the future. *Cf. Preiser v. Newkirk*, 422 U.S. 395, 401–03, 95 S.Ct. 2330, 2334–35, 45 L.Ed.2d 272 (1975). Thus, plaintiff's quests for both injunctive and declaratory relief are moot.

In any event, even if the merits of plaintiff's stated or implied claims of unconstitutional actions by defendant Kunkel are reached, those claims would not entitle plaintiff to relief herein. Maryland's statutory and regulatory parole provisions leave parole decisions to the discretion of the Maryland Parole Commission.[24] Accordingly, there is no liberty interest running in favor of plaintiff created by those parole provisions or otherwise available to plaintiff. *See Greenholtz, supra*.[25]

CONCLUSION

For the reason stated in this opinion, summary judgments will be entered in these cases in favor of all defendants.

**24.** *Cf. Page v. Einschutz*, No. H–83–1226 (D.Md. Aug. 10, 1983), a copy of which has been placed in the Court File in these cases.

**25.** As noted, *supra* note 22, the Eleventh Amendment would appear to bar any prospective injunctive relief possibly available to plaintiff of

the type provided for under *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), and its progeny, and also to bar the declaratory relief prayed for by plaintiff. *See Green v. Mansour*, 474 U.S. ——, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985).